67 F.3d 1063
 ENDICO POTATOES, INC., McCain Foods, Inc. and UFS
Industries, Inc., Plaintiffs-Appellants-Cross-Appellees,
v.
CIT GROUP/FACTORING, INC., Defendant-Appellee-Cross-Appellant.
 Nos. 1751, 1961, Docket 94-9330, 94-95-7080.
 United States Court of Appeals,
Second Circuit.
 Argued June 30, 1995.
Decided Oct. 2, 1995.
 
 1
 Mark C.H. Mandell, Annandale, NJ, for plaintiffs-appellants-cross-appellees.
 
 
 2
 Donald B. Relkin, New York City (S. Robert Schrager, Marc D. Klein, Kreindler & Relkin, P.C., New York, N.Y.) for defendant-appellee-cross-appellant.
 
 
 3
 Before VAN GRAAFEILAND and MINER, Circuit Judges, and COTE, District Judge.*
 
 COTE, District Judge:
 
 4
 This action involves a dispute between those who sold products to, and the entity that financed the operations of a licensed dealer in perishable agricultural commodities, N. Merberg & Sons, Inc. ("Merberg"), which is now in bankruptcy. To resolve this dispute, we interpret and apply provisions of the Perishable Agricultural Commodities Act of 1930 ("PACA"), 7 U.S.C. Sec. 499a-499s.
 
 
 5
 Appellants-Cross-Appellees Endico Potatoes, Inc. ("Endico"), McCain Foods, Inc. ("McCain"), and UFS Industries, Inc. ("UFS") (referred to collectively as the "Producers"), are three of forty-four companies that filed this action on August 1, 1991, seeking to recover from Elliot Merberg, the president of Merberg, and CIT Group/Factoring, Inc. ("CIT"), Merberg's secured lender, some $2 million owed to the Producers by Merberg for the sale of products claimed to fall within PACA. The Producers contend that they are beneficiaries of a trust established by PACA and consequently have a right to Merberg's accounts receivable superior to CIT, which has received nearly $3 million in payments on Merberg's accounts receivable since Merberg filed its bankruptcy petition. On August 19, 1993, as amended by an Order of November 24, 1993, the Honorable Leonard B. Sand of the Southern District of New York ruled on the parties' cross-motions for summary judgment, dismissing the claims against CIT asserted by UFS and McCain and granting Endico recovery against CIT in the amount of $10,659.11 plus interest.
 
 
 6
 On appeal the parties raise three issues. First, CIT asserts that Judge Sand erred in finding that CIT did not obtain an interest in Merberg's accounts receivable free of the PACA trust. Second, the Producers contend that Judge Sand read the PACA trust provisions and accompanying regulations in an overly restrictive manner in finding that the great majority of the goods sold by the Producers did not fall within PACA. Finally, Endico challenges Judge Sand's award of prejudgment interest at a rate of 6.09 percent rather than 9 percent.
 
 STANDARD OF REVIEW
 
 7
 The district court may grant summary judgment so long as the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). To defeat a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Fed.R.Civ.P. 56(e); accord Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir.1994). This Court must review a grant of summary judgment de novo, and may affirm the grant so long as no factual dispute exists or, based on the substantive law at issue, any existing factual dispute is not material.
 
 
 8
 In this case, the relevant facts are essentially without dispute. Merberg was, prior to entering bankruptcy on May 10, 1991,[1] a dealer in perishable agricultural commodities and other foodstuffs. CIT provided financing to Merberg and held security interests in all of Merberg's assets including its equipment, inventory, and most significantly, accounts receivable. CIT's relationship to Merberg is governed by agreements that are in the record. The Producers each sold various foodstuffs to Merberg, which they claim are protected by the PACA trust provisions, and for which they have not received payment. The nature of the goods sold by the Producers to Merberg is based on affidavits and other information supplied by the Producers and which has not been challenged by CIT. Because there are no material facts in dispute, the Court may disturb Judge Sand's ruling only if the Court finds that additional facts are necessary in order to resolve the issues, or reaches a different conclusion in applying the controlling law to the facts presented.
 
 PACA
 
 9
 PACA was enacted in 1930 in order to regulate the sale of perishable commodities. As stated in the House Report to the 1984 amendments to the Act, which are the focus of this action, PACA was enacted
 
 
 10
 to encourage fair trading practices in the marketing of perishable commodities by suppressing unfair and fraudulent business practices in marketing of fresh and frozen fruits and vegetables ... and providing for collecting damages from any buyer or seller who fails to live up to his contractual obligations.
 
 
 11
 H.R.Rep. No. 543, 98th Cong., 2d Sess. 3 (1983), reprinted in 1984 U.S.C.C.A.N. 405, 406. The Act requires licensing of all entities qualifying as commission merchants, dealers, and brokers in perishable agricultural commodities, 7 U.S.C. Sec. 499c(a), and provides for various remedies that may be enforced either through a complaint filed with the Secretary of Agriculture, or through an action in any court of competent jurisdiction. Id. Sec. 499e(b).
 
 
 12
 Although PACA as first enacted provided some protection for sellers of fresh produce, in 1984 Congress determined that greater protection was warranted. According to Congress, due to the need to sell perishable commodities quickly, sellers of perishable commodities are often placed in the position of being unsecured creditors of companies whose creditworthiness the seller is unable to verify. Due to a large number of defaults by the purchasers, and the sellers' status as unsecured creditors, the sellers recover, if at all, only after banks and other lenders who have obtained security interests in the defaulting purchaser's inventories, proceeds, and receivables. See JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 77 (2d Cir.1990); H.R.Rep. No. 543, at 3, reprinted in 1984 U.S.C.C.A.N. at 406-07. In order to redress this imbalance, Congress added Section 499e(c) to PACA, Pub.L. No. 98-273, 98 Stat. 165 (1984), which impresses a trust in favor of the sellers on the inventories of commodities, the products derived therefrom, and the proceeds of sale of such commodities and products. H.R.Rep. No. 543, at 4, reprinted in 1984 U.S.C.C.A.N. at 407.
 
 
 13
 Specifically, Section 499e(c)(2) of PACA provides that
 
 
 14
 [p]erishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities ... until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents.
 
 
 15
 7 U.S.C. Sec. 499e(c)(2).[2] This provision imposes a "non-segregated floating trust" on the commodities and their derivatives, and permits the commingling of trust assets without defeating the trust. 7 C.F.R. Sec. 46.46(c); see also JSG Trading, 917 F.2d at 78. Through this trust, the sellers of the commodities maintain a right to recover against the purchasers superior to all creditors, including secured creditors. See, e.g., 7 U.S.C. Sec. 499e(c)(1); Tom Lange Co. v. Lombardo Fruit & Produce Co., 12 F.3d 806, 809 (8th Cir.1993); Regulations under the Perishable Agricultural Commodities Act, 49 Fed.Reg. 45735, 45738 (1984); see also First State Bank of Miami v. Gotham Provision Co., 669 F.2d 1000, 1009-10 (5th Cir.) (interpreting Section 206 of the Packers and Stockyards Act, 7 U.S.C. Sec. 196, on which the PACA trust provision was based), cert. denied, 459 U.S. 858, 103 S.Ct. 129, 74 L.Ed.2d 111 (1982).
 
 CIT'S LIABILITY
 
 16
 Although not expressly stated in PACA, courts have unanimously held that the trust created by PACA is governed by general trust principles. See, e.g., Consumers Produce Co. v. Volante Wholesale Produce, Inc., 16 F.3d 1374, 1381 (3d Cir.1994); C.H. Robinson Co. v. Trust Co. Bank, N.A., 952 F.2d 1311, 1316 (11th Cir.1992). At issue in this action is the well recognized principle from trust law that a bona fide purchaser of trust assets receives the assets free of any claim by the trust beneficiaries. See Restatement (Second) of Trusts Sec. 284 (1959); Consumers Produce, 16 F.3d at 1380; C.H. Robinson, 952 F.2d at 1313-14; George G. Bogert & George T. Bogert, The Law of Trusts and Trustees Sec. 881 (Rev.2d Ed.1995); see also Amendments to the Perishable Agricultural Commodities Act: Hearing on H.R. 3867 Before the Subcomm. on Domestic Marketing, Consumer Relations and Nutrition of the House Comm. on Agriculture, 98th Cong., 1st Sess. 24-25 (1983) (Subcommittee Chairman Leon Panetta and John Gardner, Chief of the Department of Agriculture's Fruit and Vegetable Division Regulatory Branch, describing, in substance, the concept of a bona fide purchaser).
 
 
 17
 CIT contends that it qualifies as a bona fide purchaser of Merberg's accounts receivable and thus takes them free of any claim asserted by the beneficiaries of the PACA trust. The Producers, who prevailed before Judge Sand, assert that CIT is no more than a secured lender who, as the legislative history regarding the 1984 amendment to PACA indicates, holds its security subject to the rights of the trust beneficiaries.
 
 
 18
 As defined by the Restatement, a bona fide purchaser is one "who takes [trust property] for value and without notice of the breach of trust, and who is not knowingly taking part in an illegal transaction." Restatement (Second) of Trusts Sec. 284. Further, a transfer is for value "[i]f money is paid or other property is transferred or services are rendered as consideration for the transfer of trust property." Id. Sec. 298. Thus, in order for CIT to prevail it must demonstrate that it obtained its interest in the accounts receivable in exchange for value, without notice that the transfer was in breach of the trust, and in good faith. This Court finds, as did Judge Sand, that CIT did not obtain any interest in the accounts receivable in exchange for value, but holds only a security interest in those accounts, and thus holds the accounts receivable subject to the rights of the trust beneficiaries.
 
 
 19
 On January 1, 1985, Manufacturers Hanover Commercial Corporation, CIT's predecessor, and Merberg entered into an Accounts Receivable Financing Agreement. The agreement provides that CIT will
 
 
 20
 make loans and advances to [Merberg] on a revolving basis. Such loans and advances shall be in amounts mutually agreed upon up to eighty per cent (80%) of the outstanding Eligible Accounts Receivable,
 
 
 21
 which are defined in essence as any accounts receivable considered by CIT to be collectable. In return, Merberg agreed to
 
 
 22
 transfer, assign and grant to [CIT] a continuing lien on and security interest in all of [Merberg's] right, title and interest in and to all of [Merberg's] now existing and future
 
 
 23
 accounts receivable and related assets.
 
 
 24
 Pursuant to this agreement, CIT lent funds to Merberg on a revolving basis. Merberg's customers submitted payment directly to Merberg, which would then endorse the checks and deposit them in an account for the benefit of CIT. After Merberg's bankruptcy, and pursuant to a stipulation and order signed by United States Bankruptcy Judge Howard Schwartzenberg, CIT continued to receive the proceeds of Merberg's accounts receivable. CIT does not dispute that PACA trust beneficiaries have rights in trust assets superior to creditors who hold a security interest in those assets. CIT contends, however, that pursuant to the Financing Agreement it paid value for its interest in the accounts receivable and thus is more than a mere secured creditor.
 
 
 25
 Resolution of whether the "contemporaneous transfer," as CIT describes Merberg's assignment of accounts receivable to CIT and CIT's loan advances to Merberg, constitutes a purchase for value or whether the exchange provides CIT with no more than a security interest, depends on the substance of the relationship between CIT and Merberg, and not simply the label attached to the transaction. In determining the substance of the transaction, the Court may look to a number of factors, including the right of the creditor to recover from the debtor any deficiency if the assets assigned are not sufficient to satisfy the debt, the effect on the creditor's right to the assets assigned if the debtor were to pay the debt from independent funds, whether the debtor has a right to any funds recovered from the sale of assets above that necessary to satisfy the debt, and whether the assignment itself reduces the debt. Major's Furniture Mart, Inc. v. Castle Credit Corp., 602 F.2d 538, 543-46 (3d Cir.1979); Levin v. City Trust Co., 482 F.2d 937, 940 (2d Cir.1973); Hassett v. Sprague Electric Co., 30 B.R. 642, 647-48 (Bankr.S.D.N.Y.1983); In re Evergreen Valley Resort, Inc., 23 B.R. 659, 660-61 (Bankr.D.Me.1982). The root of all of these factors is the transfer of risk. Where the lender has purchased the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor. If the lender holds only a security interest, however, the lender's risk is derivative or secondary, that is, the borrower remains liable for the debt and bears the risk of non-payment by the account debtor, while the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to satisfy the loan.
 
 
 26
 The first sentence of the financing agreement belies the contention that CIT purchased the accounts receivable. As the agreement states, CIT is "pleased to confirm the terms and conditions under which we shall make loans and advances to you upon the security of your accounts receivable." Just as important, the terms of the agreement make clear that what CIT held was no more than a security interest. Merberg's assignment of accounts receivable had no effect on the outstanding balance of Merberg's indebtedness. Instead, Merberg's loan balance was reduced only upon receipt of payment, whether such payments arose from the accounts receivable or from any other source. Moreover, CIT could demand payment directly from Merberg at any time for the entire outstanding loan balance notwithstanding that CIT held what it termed an assignment of Merberg's accounts receivable. Finally, in the event that Merberg paid all outstanding obligations to CIT, CIT would no longer hold an interest in Merberg's outstanding accounts receivable. Each of these provisions indicates that the primary risk of a customer's non-payment remained at all times with Merberg and that the assignment alone did not reduce Merberg's obligations to CIT.
 
 
 27
 CIT also asserts that even if it does not hold the accounts receivable as a bona fide purchaser, it should benefit from the protections of Section 304(2)(c) of the Restatement. Section 304 provides three limited exceptions to the general rule that a transfer of trust property to satisfy an antecedent debt does not constitute a transfer for value. Restatement (Second) of Trusts Sec. 304(2). CIT, however, did not receive the accounts receivable "in consideration of the extinguishment in whole or in part of a pre-existing debt." Id. Sec. 304(2). To the contrary, the loan agreement provides expressly that Merberg's outstanding loan balance is decreased only upon receipt of funds from Merberg or Merberg's customers.
 
 
 28
 Because CIT held only a security interest in Merberg's accounts receivable, and did not purchase those accounts for value, its interest is subject to the rights of the PACA trust beneficiaries. Accordingly, any accounts receivable arising from the sale by Merberg of perishable agricultural commodities or other products that Merberg produced from perishable agricultural commodities, which remained unpaid as of the date of Merberg's bankruptcy, were property of the PACA trust. CIT must, therefore, disgorge amounts collected on the accounts after Merberg's bankruptcy filing to the extent necessary to satisfy claims of PACA trust beneficiaries.
 
 PRODUCER'S RIGHT TO RECOVER
 
 29
 Having determined that the accounts receivable are subject to claims by PACA trust beneficiaries, we turn next to the issue of whether the Producers qualify as beneficiaries. The Producers assert that in denying them coverage, Judge Sand misread Section 499e(c)(2) of PACA. We find that Judge Sand, in a thoughtful analysis of the issues, properly interpreted Section 499e(c)(2) to cover only "unprocessed or minimally processed fruits and vegetables." A & J Produce Corp. v. CIT Group/Factoring, Inc., 829 F.Supp. 651, 658 (S.D.N.Y.1993). We also agree with Judge Sand's application of that Section to the products sold by the Producers, with one exception.
 
 
 30
 Although the protections granted by the PACA trust are broad, they cover only a narrowly defined set of products. The Act governs only transactions in "perishable agricultural commodities," which are defined as, "whether or not frozen or packed in ice: Fresh fruits and fresh vegetables of every kind and character." 7 U.S.C. Sec. 499a(b)(4)(A). The Producers, relying on a creative reading of Section 499e(c)(2), assert that a trust is created upon the sale of not only perishable agricultural commodities, but also their derivatives. This reading conflicts with the language of the statute and ignores its distinction between transactions that create the trust and the assets held within the trust.
 
 
 31
 Section 499e(c)(2) of PACA, while not a model of clarity, distinctly separates perishable agricultural commodities from derivative products. The very first phrase of the Section defines the transactions that give rise to a PACA trust, speaking only of transactions in which perishable agricultural commodities are received. 7 U.S.C. Sec. 499e(c)(2). The provision goes on to define the trust assets to include those commodities as well as food or "other products derived from perishable agricultural commodities," and assets derived from the sale of those "commodities or products." Id. Finally, the provision indicates that the trust is created for the benefit of "all unpaid suppliers or sellers of such commodities."[3] Id. (emphasis added).
 
 
 32
 Section 499e(c)(2)'s broader definition of trust assets to include not only the commodities that create the trust but also derivative products is necessary in order for the trust to have any value. As Judge Sand quite aptly observed:
 
 
 33
 The trust must cover a broader category of goods, i.e. the products derived from perishable produce, if the statute is to afford any protection whatsoever to suppliers; otherwise, all the producer would need to do is process the fresh produce he receives to be free of any PACA liability.
 
 
 34
 A & J Produce, 829 F.Supp. at 657-58.
 
 
 35
 Nor can the statute be read to accommodate the Producers' claim that a PACA trust is created by the sale of products that are derived from perishable commodities but which remain in essentially their natural state, for example, Endico's breaded cauliflower, as opposed to any product derived from such a commodities, such as ethanol. If the creation of a PACA trust is not limited to transactions in perishable agricultural commodities, there is no rational means of limiting the language of Section 499e(c)(2) to cover less than all transactions in all derivative products, including even transactions in accounts receivable arising from the sale of those products. This result would be at odds with the language of the statute discussed above and its limited purposes as set out in Section 499e(c)(1) of PACA.
 
 
 36
 Having determined that it is only transactions in perishable agricultural commodities that create a PACA trust, we turn to an examination of the specific products for which the Producers have claimed protection. As noted above, Section 499a(b)(4) of PACA defines perishable agricultural commodities as "[f]resh fruits and fresh vegetables," whether or not frozen or packed in ice. The Court agrees with the standard articulated by Judge Sand in applying this provision, that PACA covers only those commodities that are in their natural form or are subject to
 
 
 37
 a change in form which does not change the essential nature of the item, such as slicing, or a change which is meant only to temporarily preserve the fruit or vegetable, such as freezing or adding a preservative chemical.
 
 
 38
 A & J Produce, 829 F.Supp. at 658. This rule comports with both the language and purpose of the statute and the supporting regulations. 7 U.S.C. Sec. 499e(c)(2); 7 C.F.R. Sec. 46.2(u).
 
 
 39
 The interpretation of PACA set forth by Judge Sand and confirmed by this Court disposes of a number of the claims that the Producers continue to press. UFS sold cole slaw, potato salad, other salads, and many items made from and containing fresh fruits and vegetables to Merberg. The percent of fresh commodities contained in these products ranges from 4 percent in UFS's cream cheese with scallions to 86 percent for UFS's potato salad. A portion of Endico's claim relates to the sale of frozen onion rings, breaded cauliflower, zucchini sticks, and pickles. Each of these products contains less than 90 percent fresh ingredients. We affirm Judge Sand's finding that none of these products qualify for PACA trust protection.
 
 
 40
 The only remaining products at issue are Endico and McCain's potato products. The bulk of the potatoes produced by both Endico and McCain are processed in the same manner. The fresh potatoes are first steam peeled and sliced in the manner requested by the customer. The sliced potatoes are then "water blanched" for 14 to 16 minutes at 160 to 168 degrees fahrenheit. After blanching, the potatoes are "surface seared" by placing them in a hot oil bath for 30 to 90 seconds in order to dry the potatoes prior to freezing, a step that the Producers assert without contradiction is a necessary part of the water blanching operation. The purpose of the water blanching and oil searing, according to the Producers, is to prevent the potatoes from turning black when frozen. In addition to this processing, Endico indicates that a portion of its potato products receive a light oil spray at the request of some customers. According to Endico, this spray enables the potatoes to be oven baked rather than deep fried. An additional portion of Endico's potato products receives a light breading. The United States Department of Agriculture qualified $10,659.10 of Endico's $86,538.61 claim as falling within PACA, and qualified all of McCain's $15,094.56 claim.[4] Judge Sand awarded judgment in favor of Endico for $10,659.11 of its claim, and denied McCain's claim in its entirety.
 
 
 41
 Because the Act specifically protects both fresh and frozen fruits and vegetables, and because the regulations provide that water blanching will not take produce outside of PACA's protection, we find that Endico and McCain may recover for potatoes that are oil seared as part of the water blanching process.[5] In contrast to the oil searing, we agree with Judge Sand that those potato products that Endico treated with either an oil spray or a light breading do not qualify for protection under PACA. These treatments are not part of the freezing process, but are intended to prepare the potatoes for a certain type of cooking, thereby changing the character of the potatoes. Accordingly, Endico may not recover from CIT for amounts owed by Merberg for these types of products.
 
 PREJUDGMENT INTEREST
 
 42
 The final issue raised in this appeal is the appropriate interest rate to apply to the award. The decision whether to grant prejudgment interest and the rate used if such interest is granted "are matters confided to the district court's broad discretion, and will not be overturned on appeal absent an abuse of that discretion." Commercial Union Assurance Co. v. Milken, 17 F.3d 608, 613-14 (2d Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 198, 130 L.Ed.2d 130 (1994). Judge Sand awarded prejudgment interest at a rate of 6.09 percent. The Producers assert that their cause of action is essentially a state law claim for breach of contract and interference with possession of property, and thus Judge Sand should have used the New York statutory 9 percent rate.
 
 
 43
 Although the Producers assert that their claim is essentially a state law claim, it is not. The claim asserted by the Producers is purely a product of a federal statute that, while it has similarities to common law actions based on a breach of trust, contains unique elements. Significantly, had the Producers' claims been based on state law, each of their claims would have been dismissed for lack of subject matter jurisdiction--the claims of McCain and UFS were for less than $50,000 and there is no diversity of citizenship between Endico and CIT. Accordingly, Judge Sand's use of a 6.09 percent rate does not constitute an abuse of discretion. See, e.g., Bank of Los Angeles v. Official PACA Creditors' Committee, 132 B.R. 632, 641 (Bankr.9th Cir.1991) (applying federal prejudgment interest rate to PACA claim).
 
 CONCLUSION
 
 44
 For the reasons stated, we affirm in part, reverse in part, and remand the case to the district court for entry of judgment in accordance with this opinion.
 
 
 
 *
 The Honorable Denise Cote of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 Merberg and its parent company, Diversified Foodservice Distributors, Inc., filed for Chapter 11 bankruptcy on May 10, 1991. On December 26, 1991, the petitions were converted to Chapter 7. In re N. Merberg & Sons, Inc., 166 B.R. 567, 569 (Bankr.S.D.N.Y.1994)
 
 
 [2]
 The Act also provides strict limits regarding the credit terms that may be granted to the purchaser in order for the sale to fall within the trust provision and requires prompt notice of non-payment to the Secretary of Agriculture and to the purchaser. 7 U.S.C. Sec. 499e(c)(3); 7 C.F.R. Sec. 46.46(f)(1)-(2). Although compliance with these requirements was at issue before Judge Sand, they are not at issue in this appeal
 
 
 [3]
 The regulations promulgated by the Department of Agriculture confirm this reading of the statute. Section 46.46(e)(1) of the regulations provides that "[c]ommission merchants, dealers and brokers are required to maintain trust assets in a manner that such assets are freely available to satisfy outstanding obligations to sellers of perishable agricultural commodities." 7 C.F.R. Sec. 46.46(e)(1) (emphasis added); see also H.R. No. 543, at 3-4 (discussing only sales of perishable agricultural commodities as specifically defined in 7 U.S.C. Sec. 499a(b)(4)); 7 C.F.R. Sec. 46.46(c) ("The trust is made up of perishable agricultural commodities received in all transactions, all inventories of food or other products derived from such perishable agricultural commodities, and all receivables or proceeds from the sale of such commodities and food or products derived therefrom.")
 
 
 [4]
 CIT asserts that the Department of Agriculture qualified McCain's claim without knowledge that McCain subjected the potatoes to oil searing. It is not clear from the record what information was available to the Department of Agriculture at the time it received the notice of claim from McCain
 
 
 [5]
 Judge Sand ruled without the benefit of the Department of Agriculture's proposed amendment to 7 C.F.R. Sec. 46.2(u) to include expressly oil blanching. 59 Fed.Reg. 35487 (July 12, 1994). Although the regulation has not yet been enacted, the comment period on the rule has closed, and the rule has not been withdrawn. As stated by the Supreme Court in Anderson Brothers Ford v. Valencia, 452 U.S. 205, 213, 101 S.Ct. 2266, 2271, 68 L.Ed.2d 783 (1981) (action involving Trust in Lending Act, 15 U.S.C. Sec. 1601 et seq.), while not a final rule, the Department of Agriculture's position regarding the appropriate scope of the act is not "wholly without significance."