ALBEE TOMATO, INC., E. Armata, Inc., R & C Communale, Costa & Harris, Inc., Craig–Ann Produce, Inc., D'Arrigo Bros. Co. of New York, Inc., Fierman Produce Exchange, Inc., Finest Fruits, Inc., G & B Produce, Inc., Hunts Point Tomato, Co., Inc., Kleiman & Hochberg, Inc., Kornblum & Co., Inc., Krisp Pak Sales Corp., L & K Tomatoes, Inc., L & P Fruit Corp., M & R Tomato Distributors, Inc., Morris Okun, Inc., M & R Trading Co., Inc., Rubin Bros. Produce, Inc., H. Schnell & Co., Inc., Square Produce, Inc., Martin Striks & Son, Inc., Vita–Wellbrock–Kearney, Inc., Wishnatzki & Nathel, Inc., Plaintiffs–Appellants,

v.

A.B. SHALOM PRODUCE CORP., Young Ok Lee, Ryung Cil Yi d/b/a RNK Produce, RNK Grocery, Inc., Defendants,

Korea Commercial Bank of New York, Defendant–Appellee.

Docket No. 96–7806.

United States Court of Appeals, Second Circuit.

Argued March 19, 1997.

Decided Sept. 21, 1998.

Leonard Kreinces, Great Neck, NY, for Plaintiffs–Appellants.

Sherylee F. Bauer, Blum, Gersen & Wood (Ralph K. Wood, of counsel), New York City, for Defendant–Appellee.

Before WINTER, Chief Judge,
FEINBERG, Circuit Judge, and POLLACK, District Judge.*

WINTER, Chief Judge:

This appeal raises the issue of when a lender must disgorge funds received from a commodities dealer and used to pay down the dealer's debt when the payment was in viola-tion of the trust provisions of the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. §§ 499a–499s. Appellants are various New York and Massachusetts corporations engaged in the business of buying and selling fresh fruit and vegetables. They appeal from Judge Lowe's grant of summary judg-ment to Korea Commercial Bank of New York ("KCB") and from the denial of their cross-motion for summary judgment. Appel-lants urge us to order KCB to disgorge approximately $800,000 deposited by A.B. Shalom Produce Corp. ("Shalom") and used to pay down Shalom's overdraft debt to KCB. The district court held that KCB had established as a matter of law that it was a bona fide purchaser for value of the deposits and, therefore, not liable under PACA. We disagree.

The background of the appeal can be brief-ly stated. Shalom is a licensed "dealer" and "commission merchant" of perishable com-modities, as defined by PACA. *See id.* § 499a(5),(6). In the course of its business, Shalom bought perishable commodities from appellants for resale to retail stores. Shalom bought the commodities on credit, and, when it became insolvent, it owed substantial amounts to appellants for sales going back to August 1988.

From 1986 to January 1990, Shalom main-tained a checking account with KCB, a com-mercial bank. The account included an over-draft credit line that was set at $120,000 in 1986 and extended to $150,000 in 1988. Sha-lom's overdraft account was secured by per-sonal guarantees, a promissory note, a secu-rity interest in Shalom's inventory, accounts receivable, and other assets, and a second mortgage on residential property owned by Shalom's principals. Beginning in July 1988, it was agreed that deposits in the checking account would automatically reduce any in-debtedness to KCB. Throughout the relevant period, there appears never to have been a positive balance in this account. Moreover, there were repeated and often sizeable nega-tive balances exceeding the overdraft limit. However, KCB remained confident that Sha-

* The Honorable Milton Pollack, of the United States District Court for the Southern District of New York, sitting by designation.

lom would be able to pay the bank debt. The duration of the numerous periods in which Shalom exceeded the overdraft limit were generally brief, although a few were extended. In addition, KCB perceived that Shalom was making progress in collecting accounts receivable. KCB also understood that Shalom was in a business where there was a "time gap between sales and collection," making "credit extension ... inevitable." Finally, the KCB loans were secured. The bank's confidence in Shalom's ability to repay appears to have lasted until the present action was brought in December 1989. Under PACA, however, the key issue is not whether KCB reasonably expected its loans to be repaid but whether KCB had any reason to believe that Shalom was not paying appellants, its suppliers.

■ At issue in the present case is a 1984 amendment to PACA that creates a statutory trust for the benefit of unpaid produce suppliers. *See* 7 U.S.C. § 499e(c)(2); *Consumers Produce Co. v. Volante Wholesale Produce, Inc.*, 16 F.3d 1374, 1378 (3d Cir.1994). The PACA amendment requires the purchaser of agricultural commodities to hold any receivables or proceeds from the sale of the commodities "in trust for the benefit of all unpaid suppliers or sellers of such commodities ... until full payment of the sums owing in connection with such transactions has been received [by the suppliers]. ..." 7 U.S.C. § 499e(c)(2). This provision gives unpaid suppliers such as appellants priority over secured lenders such as KCB to PACA trust assets. *See Consumers*, 16 F.3d at 1379. Appellants claim that Shalom violated the PACA trust by depositing the proceeds from the sales of commodities in its KCB account in order to reduce its overdrawn balance rather than paying appellants, the trust beneficiaries. They further claim that KCB must disgorge those deposits because, as trust beneficiaries, they hold a superior interest in the trust assets.

■ PACA does not impose explicit obligations upon, or provide explicit remedies against, third-party transferees who receive trust property in breach of trust. The trust created by PACA is governed by general principles of trust law. *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1067 (2d Cir.1995). Those principles allow a "bona fide purchaser" to retain trust property even if the property was transferred in breach of trust. *Id.* at 1067–68; Restatement (Second) of Trusts § 284(1) (1959). To qualify as a bona fide purchaser, the transferee must take the property "for value and without notice of breach of trust." *Endico Potatoes*, 67 F.3d at 1068 (quoting Restatement, *supra*, § 284(1)). A third-party transferee may escape liability, therefore, if it: (i) gave value for the trust property *and* (ii) had no actual or constructive notice of the breach of trust. In establishing the protected status of bona fide purchaser, the burden of proof is on the transferee. *Oscar Gruss & Son v. First State Bank*, 582 F.2d 424, 432 (7th Cir.1978) (holding that party claiming to be bona fide purchaser under Article 8 of U.C.C. bears burden of proof). *See, e.g., Natural Resources, Inc. v. Wineberg*, 349 F.2d 685, 688 n. 8 (9th Cir.1965) (stating that defendant's claim that he is an innocent purchaser is an affirmative defense and he bears the burden of proof).

■ With regard to whether KCB had actual or constructive knowledge of the trust, KCB's own submission in support of its motion for summary judgment indicated that it knew both that Shalom's business entailed the purchase of agricultural commodities for resale and that Shalom's accounts receivable were proceeds from those resales. KCB appears to have been entirely innocent of PACA's requirements, or even existence, for most of the period in question. However, ignorance of a statute's imposition of a trust on certain defined assets cannot shield a transferee with knowledge of facts that render assets the property of that trust. *See Consumers*, 16 F.3d at 1381; *C.H. Robinson Co. v. Trust Co. Bank*, 952 F.2d 1311, 1315 & n. 4 (11th Cir.1992).

■ Turning to whether Shalom's transfer of funds to KCB was for value, the general rule is that where "the trustee transfers trust property in consideration of the extinguishment of a pre-existing debt or other obligation, the transfer is not for value." Restatement, *supra*, § 304(1). However, there is a "money-transfer" exception to the for-value rule that allows a transferee to receive trust property if the property is "a negotia-

ble instrument or money." *Id.* § 304(2)(a). The rationale for this exception is simply that many ordinary financial transactions would be impossibly cumbersome if every recipient of money from a trustee—*e.g.,* utilities receiving payments from most law firms—bore the burden of verifying the payor's title to the money. *See C.H. Robinson,* 952 F.2d at 1314.

Whether the money-transfer exception would apply to KCB's receipt of Shalom's deposits, however, is anything but clear. KCB's evidentiary submission indicated that it knew that the money it was receiving was from Shalom's collection of accounts receivable for the resale of agricultural commodities. A trier of fact might easily find, therefore, that KCB knew it was receiving funds that were PACA trust assets, and application of the money-transfer exception in those circumstances would seem doubtful. Whether the money-transfer exception is available to a transferee who knows that the cash being received is a trust asset need not be decided, however, because KCB's submission did not entitle it to summary judgment as to whether it knew of the breach of trust.

■ We come then to the nub of the case—whether KCB had actual or constructive notice of the breach of trust. There is no evidence that KCB had actual knowledge of Shalom's breach of the PACA trust. However, under general principles of trust law, a transferee has the requisite constructive knowledge when it "should know" of the breach of trust. Restatement, *supra,* § 297. A transferee should know of a breach of trust when

> he [or she] knows facts which under the circumstances would lead a reasonably intelligent and diligent person to inquire whether the trustee ... is committing a breach of trust, and if such inquiry when pursued with reasonable intelligence and diligence would give him [or her] knowledge or reason to know that the trustee is committing a breach of trust.

*Id.* § 297 cmt. a. We are unable to say on the record before us that a reasonable trier of fact could not find that KCB should have known of Shalom's breach of trust.

As noted, Shalom opened its account with KCB in 1986, with a $120,000 overdraft privi-

lege. Internal KCB reports dated July 1988 and June 1989 assessed Shalom's financial condition favorably. The financial statements depicted Shalom's income having grown from $11,000 in 1986 to $14,000 in 1987 to $40,000 in 1988 and then declining to $21,000 in 1989. The July 1988 report commented that "borrower showed steady and remarkable growth both in terms of quantity and quality of transaction." The report recommended extending credit to Shalom because "considering the borrower's nature of business, there always exists time gap between sales and collection." Similarly, the June 1989 report stated that "[t]he business is expected to continuously develop in a favorable manner." The report found that "borrower is actively engaged in business with sincere and capable management." It again concluded:

> Considering the borrower's nature of business, there is always a time gap present between sales and collection, thus requiring the borrower to need more operational funds. Considering the sound financial structure and good trend of the business, this overdraft credit extension is recommended.

KCB senior Vice President Hoon Hyuk Yoon's affidavit states that Shalom provided KCB with favorable—although in hindsight perhaps fraudulent—financial reports and that "KCB consistently asked for, received and reviewed financial data. Young Ok Lee, an officer of Shalom, submitted copies of accounts receivable and payable to the bank. None of these financials reflected overdue PACA payables."

The record also contains June 1989 unaudited financial statements, prepared by Shalom's accountant and submitted to KCB. The statements show 1989 pre-tax income of approximately $20,600, matching the amount disclosed in KCB's 1989 report. However, this was accompanied by a broad disclaimer in the accountant's letter accompanying the financial reports:

> Management has elected to omit all of the disclosures and the statement of changes in financial position required by generally accepted accounting principles. If the omitted disclosures were included in the

financial statements, they might influence the user's conclusions about the company's financial position, results of operations, and changes in financial position. Accordingly, these financial statements are not designed for those who are not informed about such matters.

The record shows that KCB had a reason for concern other than this disclaimer. Shalom's checking account consistently had a negative balance that frequently exceeded the overdraft privilege. In the three-month period in 1988 beginning just after the first purchase of commodities for which Shalom defaulted, it exceeded the overdraft limit many times. Many of the excess negative balances were for only part of one day, but some were for extended periods.

We conclude that, on these facts, KCB was not entitled to summary judgment. KCB was the moving party as to the bona fide purchaser defense, but it was also the party that bore the burden of proof. We must, therefore, view the facts in the light most favorable to appellants and may grant summary judgment to KCB only if the record shows that it was a bona fide purchaser as a matter of law. *See, e.g., Perry v. O'Donnell,* 749 F.2d 1346, 1349 (9th Cir.1984) (reviewing grant of summary judgment and finding critical factor as to whether person was bona fide purchaser as matter of law). KCB's submission does not meet this standard.

■ KCB's brief implicitly adopts a test that would essentially bestow bona fide purchaser status on any lender who lacks reason to believe the PACA trustee is insolvent. However, an insolvency test would extend the protection of bona fide purchaser status well beyond the point at which breaches of PACA trusts will have occurred. We believe, therefore, that a more stringent standard is applicable. Where, as here—we do not address other possible scenarios—the PACA trustee has self-evident cash-flow problems, a lender extending a line of credit to the trustee can obtain status as a bona fide purchaser only by meeting the following test. The lender must make the kind of inquiry as to debts owed by the trustee to PACA beneficiaries that a reasonably prudent lender would make as to debts owed by a similar borrower to a prior creditor who had rights superior to those sought by the lender. We adopt this test because PACA in fact bestows just such superior rights on the beneficiary suppliers[1] and the test has the benefit of being one familiar to lenders.

KCB has not established that it met that standard as a matter of law. The record reflects only that KCB was reasonably persuaded that its arrangements with Shalom were such that the extensions of credit were a good risk. However, its inquiry and resultant conclusion were reasonable only from the perspective of a creditor who had demanded and received personal guarantees and collateral that included a security agreement covering Shalom's accounts receivable and other assets and a second mortgage on the personal residences of Shalom's principals. KCB might have reasonably believed that Shalom had a hopeful future, but it arranged affairs so as to limit its own losses if matters became bleak. In particular, KCB did not require periodic, verified data from Shalom that its debts to suppliers were being timely paid. Indeed, KCB's interest—being ignorant of PACA—and resultant inquiry were directed only to how it would ensure that it would prevail over Shalom's suppliers.

■ Yoon's affidavit is the only item in the record showing any interest by KCB in whether Shalom was paying its suppliers in a timely fashion. The district court gave great weight to this affidavit because appellants responded with only a conclusory denial of its truth. *See Albee Tomato, Inc. v. A.B. Shalom Produce Corp.,* 1995 WL 766306, at *4–5 (S.D.N.Y. Dec.28, 1995). In doing so, the court relied on the rule that a party opposing a motion for summary judgment must respond with evidence sufficient to allow a trier of fact to find in its favor. *Id.* at *5–6. However, that rule applies only to parties who both oppose the motion for summary judgment and bear the burden of proof. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Dister v. Continental Group, Inc.,*

---

1. We appreciate that PACA trustees may find it difficult to obtain credit under this test, but any statute that gives a class of general creditors priority over secured lenders may have that effect.

859 F.2d 1108, 1114 (2d Cir.1988). Where the movant has the burden, its own submissions in support of the motion must entitle it to judgment as a matter of law. *See, e.g., Calderone v. United States,* 799 F.2d 254, 258 (6th Cir.1986).

Yoon's affidavit is not sufficient to entitle a party bearing the burden of proof on the bona fide purchaser issue to judgment as a matter of law. It states only that Yoon received "financial data" of some kind, including "copies" of accounts receivable and payable that did not reflect "overdue PACA payables." Although a trier of fact might conclude that Yoon was reasonable in crediting the financial data and copies of accounts receivable and payable, a trier would certainly not be compelled to reach that conclusion. Virtually none of the data or copies of records reviewed by Yoon are in the record, and there is nothing indicating any attempts by KCB to verify the accuracy or genuineness of those data and records.

We therefore reverse the grant of summary judgment. We hold only that a lender in KCB's position, relying on a borrower's accounts receivable that are constructively known to be trust funds, is not entitled to judgment as a matter of law based on the bona fide purchaser defense where the line of credit or account reflects a consistently negative balance absent evidence of a more searching inquiry into the borrower's observance of trust obligations. For reasons stated, we hold that KCB is not liable as a matter of law and that the denial of appellants' motion for summary judgment was proper.

We therefore affirm in part and reverse in part.