### In re LONG JOHN SILVER'S RESTAURANTS, INC., et al., Debtors.

### Bankruptcy Nos. 98–1164(MFW) to 98–1169(MFW).

United States Bankruptcy Court, D. Delaware.

Feb. 10, 1999.

---

Ronald DeKoven, George J. Wade, Mark J. Shapiro, Shearman & Sterling, New York City, Counsel for Debtors and Debtors in Possession.

Pauline K. Morgan, Brendan Linehan Shannon, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE, Co-counsel for Debtors and Debtors in Possession.

Hartley B. Martyn, Mark A. Amendola, Martyn & Associates, Cleveland, OH, Counsel for Lamb–Weston, Inc.

Bayard J. Snyder, Snyder & Associates, Wilmington, DE, Co-counsel for Lamb–Weston, Inc.

## OPINION [1]

MARY F. WALRATH, Bankruptcy Judge.

This matter is before us pursuant to the Motion of Lamb–Weston, Inc. ("Lamb–Weston") for Immediate Payment of Non–Estate PACA Trust Claims.[2] Resolution of the Motion requires that we determine whether the goods sold by Lamb–Weston (french fries) to Long John Silver's Restaurants, Inc. ("LJS"), the Debtor, are "perishable agricultural commodities" as defined by the Perishable Agricultural Commodities Act, 1930 (PACA), 7 U.S.C. § 499a *et seq.* If so, then the french fries, and any products or proceeds thereof, are held in trust by LJS for Lamb–Weston and are *not* property of LJS's bankruptcy estate. *See In re Fresh Approach, Inc.,* 48 B.R. 926 (Bankr.N.D.Tex. 1985). For the reasons set forth below, we find that the goods sold by Lamb–Weston to LJS are not perishable agricultural commodities and thus are not entitled to the protections of PACA.

## I. JURISDICTION

This Court has jurisdiction over this matter as a core proceeding pursuant to 28 U.S.C. § 1334 and § 157(b)(1), (b)(2)(A), (B) and (O).

## II. FACTS AND PROCEDURAL HISTORY

In the early 1990s, LJS conducted extensive market research to determine what qualities its customers sought in a french fry. The research revealed that by a two-to-one margin the most common complaints were "old and cold, soggy french fries." In response to these complaints, LJS ultimately switched to the "crispy fry," which is coated in a batter named Crispura. LJS made this switch because the crispy fry could resist the old, cold and soggy characteristics of traditional french fries for up to ten minutes—versus five minutes for a traditional fry. Lamb–Weston produced the crispy fry per LJS's specification.

Between April 21, 1998, and June 3, 1998, LJS received frozen batter-coated french fries from Lamb–Weston for which LJS admittedly owes $1,414,807.97. Most of the french fries were crispy fries, but some were waffle, or CrissCut, fries coated with a "stealth" batter. The stealth batter fry is very difficult for consumers to distinguish from a french fry with no batter coating. There was no evidence presented which revealed the portion of the debt that corresponds to the crispy fries versus the stealth fries.

On June 2, 1998, LJS filed a chapter 11 bankruptcy petition. LJS subsequently filed a motion seeking authority to pay PACA trust claims in which it reserved its right to contest the validity of any particular PACA claim. That motion was granted; however, LJS has elected not to exercise this authority with regard to Lamb–Weston's asserted PACA claim.

On June 16, 1998, Lamb–Weston sent LJS a Notice of Intent to Preserve Trust Benefits. On June 19, 1998, Lamb–Weston filed its Motion for Immediate Payment of Non–Estate PACA Trust Claims Pursuant to Court Order Authorizing Same ("the Motion"). LJS filed its Response on July 1, 1998, asserting that the Lamb–Weston french fries were not perishable agricultural commodities. The parties presented testimony and documentary evidence at a hearing on October 9, 1998, followed by the submission of post-hearing briefs.

## III. DISCUSSION

### A. Overview of PACA Trusts in Bankruptcy

The Perishable Agricultural Commodities Act regulates the trade of "perishable agri-

---

1. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

2. The Motion was filed by both Lamb–Weston and Ready Pac/Club Chef East. Prior to the October 9, 1998, hearing, LJS determined that the Ready Pac PACA claim was valid. Accordingly, only the Lamb–Weston claim was addressed at the hearing and our decision is limited to that claim.

cultural commodities." In 1984, Congress amended PACA to provide greater protection to sellers of perishable agricultural commodities.

■ Due to the perishable nature of the goods, sellers must sell them quickly, often before a reasonable opportunity to assess the creditworthiness of the buyer. As a result, such sellers frequently find themselves unsecured because lenders have security interests in the inventory and receivables of the buyers. These suppliers are usually the least able to survive the delays and losses attendant to a bankruptcy filing by their buyers. *See* H.R.Rep. No. 543, 98th Cong., 1st Sess. 1983, reprinted in 1984 U.S.C.C.A.N. 405. In response, Congress' 1984 amendment provides that certain statutorily-defined buyers [3] of perishable agricultural commodities hold the "commodities ... and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products ... in trust for the benefit of all unpaid suppliers or sellers of such commodities ...." 7 U.S.C. § 499e(c)(2). While PACA offers very broad protection, the products which are covered are narrowly defined. *See Endico Potatoes v. CIT Group/Factoring, Inc.,* 67 F.3d 1063, 1069 (2d Cir.1995).

■ In the bankruptcy context, traditional trust principles prevail; trust assets are not property of the bankruptcy estate. *See* 11 U.S.C. § 541(d); *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 205 n. 10, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983) ("Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition"). PACA trusts are governed by these traditional principles of trust law, and they, too, are excluded from property of the estate. *See Tom Lange Co., Inc. v. Kornblum & Co., Inc. (In re Kornblum & Co., Inc.),* 81 F.3d 280, 284 (2d Cir.1996). Accordingly, a perfected PACA trust beneficiary is entitled to payment in full from the trust assets before payment to any

other creditors, whether secured or unsecured. *See id.*

■ In order to become a perfected PACA trust beneficiary, a PACA claimant must meet three requirements. First, the goods in question must be perishable agricultural commodities. Second, the commodities must have been received by a commission merchant, a dealer, or broker. Third, the claimant must have provided written notice of its intent to preserve its rights under PACA within thirty days after payment became due. *See In re L. Natural Foods Corp.,* 199 B.R. 882, 885 (Bankr.E.D.Pa.1996).

In both its briefs and at the hearing, LJS contested only Lamb–Weston's satisfaction of the first element. Thus, the scope of this opinion is limited to whether the french fries sold to LJS by Lamb–Weston are perishable agricultural commodities.

### B. *Definition of Perishable Agricultural Commodities*

Perishable agricultural commodities are defined in relevant part as "[f]resh fruits and vegetables of every kind and character." 7 U.S.C. § 499a(b)(4)(A). The Secretary of Agriculture, by authority of section 499o of PACA, has defined "fresh fruits and vegetables" to include:

[A]ll produce in fresh form generally considered as perishable fruits and vegetables, whether or not packed in ice or held in common or cold storage, but do not include those perishable fruits and vegetables which have been manufactured into articles of food of a different kind or character. The effects of the following operations shall not be considered as changing a commodity into food of a different kind or character: Water, steam, or oil blanching, chopping, color adding, curing, cutting, dicing, drying for the removal of surface moisture; fumigating, gassing, heating for insect control, ripening and coloring; removal of seeds, pits, stems, calyx, husk, pods, rind, skin, peel, et cetera; polishing, precooling, refrigerating, shredding, slicing, trimming, washing with or without

---

3. The use of the term "buyer" in this opinion is intended to include only those persons who qualify as a commission merchant, dealer, or broker

as those terms are defined by PACA. *See* 7 U.S.C. § 499a(b).

chemicals; waxing, adding of sugar or other sweetening agents; adding ascorbic acid or other agents used to retard oxidation; mixing of several kinds of sliced, chopped, or diced fruits or vegetables for packaging in any type of containers; or comparable methods of preparation.

7 C.F.R. § 46.2(u). Courts have interpreted these restrictions as limiting PACA's protection to:

[U]nprocessed or very minimally processed fruits and vegetables. The minor processing which the regulations suggest is acceptable relates mostly to a change in form *which does not change the essential nature of the item, such as slicing, or a change which is meant only to temporarily preserve the fruit or vegetable, such as freezing or adding a preservative chemical.*

*A & J Produce Corp. v. CIT Group/Factoring, Inc.,* 829 F.Supp. 651, 658 (S.D.N.Y. 1993) (emphasis added), *aff'd in relevant part sub nom. Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.,* 67 F.3d 1063 (2d Cir. 1995). Thus, we must determine whether the process utilized by Lamb–Weston to produce the french fries is such that they constitute "articles of food of a different kind or character" than a basic potato. *See* 7 C.F.R. § 46.2(u).

### 1. *The Name Game*

■ Both parties have based their arguments, in part, on what names have been used in reference to the commodities sold to LJS. Lamb–Weston argued at the hearing that the parties refer to the commodities as "french fries" and that courts have held that "french fries" are perishable agricultural commodities under PACA. Conversely, LJS asserts that the commodities in question are referred to strictly as "crispy fries" or "CrisSCut fries" and never as "potatoes." LJS thus concludes that the LJS french fries are not "french fries" and therefore do not merit the protection of PACA.

Such arguments have little merit in this case. What the parties *call* the commodity is irrelevant to the question of what the commodity actually is.[4] We note that none of the processes listed by the Department of Agriculture in section 46.2(u) concern what names the buyer or seller attribute to the end-product. The task at hand is to determine whether the fries, be they dubbed "crispy" or "french," are of a different kind or character than a potato. This determination is to be made solely on the basis of the manufacturing process, not on the basis of the marketing fancies of food industry executives. Thus, we adhere to the wisdom of Shakespeare in holding that the name of a product is not a factor in determining whether it is a perishable agricultural commodity.

### 2. *The Battering Process*

At the October 9 hearing, the parties presented extensive evidence concerning Lamb–Weston's manufacturing process and the opinions of various witnesses presented by the parties, all with extensive backgrounds in food science, concerning whether this process changed the essential character of the fries. To the extent that the witnesses testified as to their conclusions regarding PACA, it is the role of the court, not food experts, to address this legal question. Nevertheless, the testimony of these experts was helpful in determining whether the processes fall within those processes allowed by PACA.

Lamb–Weston starts its process with a regular potato. The initial processes are aimed at cleaning and shaping the potato: scrubbing, steam peeling, trimming, preheating, and cutting. Section 46.2(u) does not prohibit any of these processes; to the contrary, each of these processes is expressly permitted. *See* 7 C.F.R. § 46.2(u). The next step is a water blancher, followed by a dryer. Again, these processes are expressly allowed by the Department of Agriculture. At this stage of production, the potato has not undergone any process which merits withholding the protection of PACA.

The next stage of production presents Lamb–Weston with a choice. Most of

---

4.

O, be some other name!
What's in a name? That which we call a rose
By any other name would smell as sweet.

— William Shakespeare
*Romeo & Juliet,* Act II, scene ii

Lamb–Weston's french fries proceed directly to a fryer, the purpose of which is to inactivate enzymes in preparation for freezing. In those instances, the fryer falls within the permitted conduct defined as "oil blanching." *See* 7 C.F.R. § 46.2(u).[5] The french fries then proceed to an oil remover, a freezing tunnel, a length grader, and finally to the packaging stage.

The LJS french fries, however, were detoured from the main manufacturing route (after the initial water blanching and drying) to a batter applicator. At this stage, according to Lamb–Weston's witness, the potato strips are "run through a slurry of water and what's typically called a batter, [which] would be a suspension of batter solids in a slurry of water." The articulated purpose of the batter is to enhance the texture and flavor of the french fries. When questioned by counsel for LJS, Lamb–Weston's witness admitted that the batter serves no purpose as a preservative or in the freezing process. LJS contends that by exposing the potatoes to this slurry of water and batter, Lamb–Weston removed its product from the shelter of PACA's umbrella.

■ LJS also contends that the addition of salt to enhance flavor should bar Lamb–Weston from recovering under PACA. LJS argued that the exceptions for salt under PACA related to the use of salt as a preservative and that the salt added by Lamb–Weston played no role as a preservative, but only as a taste enhancer. We do not believe that the fact that salt enhances flavor, as well as preserves, should necessarily bar Lamb–Weston's PACA claim on this point. Section 46.2(u) permits the addition of "sugar or other sweetening agents." *See* 7 C.F.R. § 46.2(u). We view this as an indication that the Department of Agriculture does not consider flavor enhancements alone as changing the "character" of a food item.

■ In contrast, we believe that adding batter, which alters the texture of the prod-

uct, does change the "essential character" of the food item. There is no case directly on point, however the analysis employed in *Endico*[6] is particularly helpful. *See Endico,* 67 F.3d 1063. *Endico* involved PACA claims by parties who supplied food products to the debtor pre-petition. Two of the suppliers, Endico and McCain, supplied potato products which had been oil blanched. *See id.* at 1071. Additionally, some of the products were coated in a light oil spray to prepare the potatoes for oven baking as opposed to frying. *See id.* The district court denied the PACA claims arising out of the sale of the oil-sprayed potatoes, but allowed the claims for the oil-blanched potatoes. *See A & J Produce,* 829 F.Supp. at 658–659.

On appeal, the Second Circuit Court of Appeals affirmed the trial court's disallowance of the PACA claims for the oil sprayed potatoes. *See Endico,* 67 F.3d at 1071. The court noted that, unlike oil blanching, the oil spray was *not* part of the preparation for freezing. *See id.* The court held that the oil spray changed the essential nature of the product and removed it from the protection of PACA. *See id.*

While Lamb–Weston acknowledges the *Endico* ruling, it contends that it is inapplicable because it was decided prior to the amendment of section 46.2(u) which added oil blanching to the list of PACA-approved manufacturing processes. Lamb–Weston notes that no court has denied a PACA claim for french fries since the enactment of this amendment in 1996. Lamb–Weston, however, has not directed us to any PACA trust claim cases decided either before or after *Endico* which involved batter-coated french fries, let alone a case which undermines the rationale of *Endico.*

We conclude that the *Endico* ruling (and analysis) remains valid. The *Endico* court expressly acknowledged the then-pending amendment to section 46.2(u) and ruled in accordance with such amendment, holding

---

5. The reason for blanching (with water or oil) is to prevent the fry from discoloring when it is frozen. Thus, PACA allows this process as a "preparatory to freezing" process.

6. At the district court, the case was styled as *A & J Produce v. CIT/Group Factoring, Inc.* Except where analysis or facts peculiar to the district court proceeding are indicated by a citation to that decision, all references to *Endico* are references to the decision on appeal.

that "[the claimants] may recover for potatoes that are oil seared as part of the water blanching process." *Id.* at 1071 & n. 5. As stated above, the basis for the disallowance of PACA protection in the *Endico* case was the oil spraying, not the oil blanching—two distinct processes. *See id.* at 1071. There is no basis to conclude, as Lamb–Weston suggests, that the amendment to section 46.2(u) invalidated the *Endico* ruling and permitted oil-spraying in preparation for oven baking. Thus, the rationale of *Endico* is not affected by the amendment to section 46.2(u).

 *Endico* also addressed foods which had been breaded, such as breaded cauliflower and onion rings. *See id.* The court readily disallowed the claims relating to these goods without extensive comment, noting that each of these products contained less than 90 percent fresh ingredients. We decline to adhere to a rigid "percentage of fresh ingredients" threshold.[7] Instead, we believe the relevant inquiry is what the purpose of the oil spraying (or batter coating) was on the end-product. *See id.*

The batter application in this case lies somewhere between an oil spray and breading. Like the oil spray in *Endico*, the batter plays *no role* in the freezing process. By the testimony of Lamb–Weston's own representative, the purpose of the batter is, to "enhance" texture and double the "hot-hold life" of the french fries (the amount of time that a french fry will stay warm under heat lamps after cooking).[8]

Lamb–Weston's witness asserted that none of these enhancements rendered the LJS french fries non-perishable. We do not believe that the perishability of a product is necessarily determinative. Certainly potato salad is perishable, yet the *Endico* court noted that potato salad was sufficiently altered from the potato's natural character due to the addition of other substances that the product did not qualify as a perishable agricultural commodity. *See id.* Another example cited by the *Endico* court was breaded products such as onion rings. Such goods may still be perishable, but the enhancement obtained through breading would most assuredly remove the onion ring from the category of perishable agricultural commodities. *See id.*

## IV. CONCLUSION

In the end, LJS had a product that, by virtue of the application of a specially engineered batter coating, had a different texture than a traditional french fry and would stay warm for twice as long as a traditional french fry. Lamb–Weston and LJS consciously endeavored to create a product that appeared as much as possible to be a "regular" french fry while demonstrating these special attributes—attributes that a regular french fry does not possess. We find that the introduction of specially engineered batter for the purpose of achieving these "enhancements" changed the essential nature of the product. Accordingly, the amounts claimed by Lamb–Weston for pre-petition shipments of french fries to LJS are not protected by PACA and, therefore, are general unsecured claims.[9]

An appropriate Order is attached.

### ORDER

AND NOW, this **10TH** day of **FEBRUARY, 1999,** for the reasons set forth in the accompanying Opinion, it is hereby **ORDERED** that:

The Motion of Lamb–Weston, Inc. For Immediate Payment of Non–Estate PACA Trust Claims be, and the same hereby is, **DENIED.**

---

7. The parties presented extensive and contrasting testimony on what percentage of "potato content" was in the LJS french fries. LJS contended it was between 85% and 89%, while Lamb–Weston presented evidence that it was 92%.

8. These purposes were applicable to both the Crispura batter and the stealth batter.

9. It appears that some of the french fries were received post-petition. This opinion does not address the amount, if any, of Lamb–Weston's administrative claim for such shipments.