ALBEE TOMATO CO., INC., E. Armata, Inc., R & C Communale, Inc., Costa & Harris, Inc., Craig–Ann Produce, Inc., D'Arrigo Bros. Co. of New York, Inc., Fierman Produce Exchange, Inc., Finest Fruits, Inc., G & B Produce, Inc., Hunts Point Tomato Co., Inc., Kleiman & Hochberg, Inc., L & K Tomatoes, Inc., L & P Fruit Corp., M & R Tomato Distributors, Inc., Morris Okun, Inc., M & R Trading Co., Inc., Rubin Bros., Inc., H. Schnell & Co., Inc., Square Produce Inc., Martin Stricks & Son, Inc., Vita—Wellbrock–Kearney, Inc., Wishnatski & Nathel, Inc., Plaintiffs,

v.

KOREA COMMERCIAL BANK OF NEW YORK, Defendant.

No. 89 Civ. 01888(BSJ).

United States District Court, S.D. New York.

Feb. 5, 2003.

Leonard Kreinces, Great Neck, NY, for Plaintiffs.

Wood Ralph, Ralph Wood, White Plains, NY, for Defendant.

### MEMORANDUM AND ORDER

JONES, District Judge.

Plaintiffs are the unpaid sellers of perishable agricultural commodities. They commenced this action in 1989, claiming that Defendant Korea Commercial Bank ("KCB" or the "Bank") violated the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499e.[1] Plaintiffs claim that A.B. Shalom Produce Corp. ("Shalom"), a merchant that bought produce from Plaintiffs at Hunts Point Mar-

ket in Bronx, New York and sold that produce to retailers in the greater New York area (Tr. 40–42), held proceeds from these sales for them in a statutory trust created by PACA. Shalom breached this trust beginning in August 1988 by using PACA trust funds to make payments toward the reduction of Shalom's overdraft account with KCB. Plaintiffs claim that they are still owed $890,249.17 from Shalom's breach of the trust.[2]

Plaintiffs allege that Defendant KCB is liable for Shalom's breach of the trust as a third party transferee of trust assets. Plaintiffs assert that KCB owes them the full amount of Shalom's debt to them, $890,249.17, from any monies that KCB accepted from Shalom during the period of the breach, which began in August of 1988 and continued until the time that KCB froze Shalom's account on January 17, 1990. KCB asserts a number of defenses. It contends that Plaintiffs failed to perfect their rights under PACA, forfeiting their rights to trust protection. In the alternative, the Bank contends that even if Plaintiffs did perfect their rights under PACA, the Bank did not participate in Shalom's, the trustee's, breach of that trust because it did not know of Shalom's breach nor did it have reason to know of the breach. Therefore, the Bank maintains that the payments it accepted from Shalom should not be disgorged. The Bank also argues, inter alia, that Plaintiffs' damages are mitigated by the fact that a great portion of the loaned money was directed to the Plaintiff suppliers and the fact that Plaintiffs failed to timely notify the Bank of its suit to recover trust funds from Shalom.

---

1. When this action commenced, Defendant was known as Korea Commercial Bank. It later went by Hanvit Bank and is, today, called Woori America Bank. The Court shall refer to the Bank as it was named at the time this action was brought.

2. Originally, Plaintiffs claimed that Shalom owed them $1,297,928.55. This claim was reduced later when Shalom handed his accounts receivable over to the New York Produce Trade Association, which collected $407,679.34 for Plaintiffs.

## I. PROCEDURAL HISTORY

This case comes to the Court on remand from the Court of Appeals. The case was filed in March of 1989, and, in 1994, the parties cross-moved for summary judgment. Plaintiffs contended and still contend today that KCB violated PACA when it paid down Shalom's overdraft account with PACA trust moneys. Defendant claimed that it had established, as a matter of law, a "bona fide purchaser for value" defense, insulating the Bank from any liability to Plaintiffs. *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, No. CIV. A.89–01888, 1995 WL 766306, at *3 (S.D.N.Y. Dec.28, 1995) (*"Albee I"*).[3] To establish this defense, the Bank had to demonstrate that it had neither actual nor constructive knowledge of Shalom's breach. The Court (Judge Mary Johnson Lowe) determined that the Bank did not have actual notice of the breach until Plaintiffs notified the Bank of their lawsuit against Shalom in January of 1990 and that the Bank was not on constructive notice of the breach before this time, as it did not have reason to believe that Shalom was in "financial difficulty." *Id.* at *4–*6. The district court, therefore, found in favor of the Bank and dismissed Plaintiffs' claims. *Id.* at *6.

Plaintiffs appealed, and the Second Circuit reversed and remanded the case for a trial on the merits. *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612 (2d Cir.1998) (*"Albee II"*). The Circuit affirmed the lower court's holding that issues of fact precluded a liability finding for Plaintiffs, but reversed the district court's finding that KCB established a bona fide purchaser defense as a matter of law, holding that issues of fact required a trial. *Id.* at 618. The remanded case was reas-

signed to this Court. A second motion by Plaintiffs for summary judgement was denied.

A five-day bench trial ensued in February of 2001. The Court heard evidence from thirteen suppliers on behalf of fifteen Plaintiffs; the President of A.B. Shalom, Mr. Young Ok Lee; a KCB Bank officer; and Defendant's expert witness. In addition, the Court received into evidence numerous financial documents with regard to the overdraft account that Shalom maintained with the Bank. The following decision constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 52(a).

## II. The Perishable Agricultural Commodities Act

Congress enacted PACA "in 1930 to promote fair trading practices in the marketing of perishable agricultural commodities, largely fruits and vegetables." *Consumers Produce Co. v. Volante Wholesale Produce, Inc.*, 16 F.3d 1374, 1377–78 (3d Cir.1994). To that end, in 1984, Congress amended PACA to create a statutory trust for the benefit of unpaid produce suppliers, and it is this trust that is at issue in this case. *See id.; Albee II*, 155 F.3d at 615; 7 U.S.C. § 499e(c)(2). Congress created the PACA trust to address its concern that produce suppliers, forced by the nature of their perishable produce to sell their goods without security, would consistently recover from defaulting merchants only after secured lenders such as banks. *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1067 (2d Cir.1995).

■ To prevent this result, PACA provides that:

---

**3.** In *Albee I*, in addition to Korea Commercial Bank of New York, the defendants included A.B. Shalom Produce Corp.; Young Ok Lee; Ryung Cil Yi d/b/a RNK Produce; and RNK Grocery, Inc. Claims against these defendants were dismissed in a stipulation and order dated June 5, 1996.

Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents. . . .

7 U.S.C. § 499e(c)(2). In other words, a PACA trust is created immediately upon a merchant's acceptance of perishable commodities and this merchant is required to maintain in trust all the proceeds from the sale of the supplier's produce and derivatives therefrom. *See E. Armata, Inc. v. David Lee's Produce Service Corp.*, No. CIV.A.99–2042, 2002 WL 31834451, at *5 (S.D.N.Y. Dec.17, 2002). Additionally, the trust itself is a non-segregated floating trust, meaning that trust assets may be comingled with other assets without defeating the trust. *Endico Potatoes*, 67 F.3d at 1067; 7 C.F.R. § 46.46(b). A merchant, therefore, need not maintain a separate bank account for trust funds so long as trust obligations are met. *See, e.g., Fresh Kist Produce, LLC. v. Choi Corp., Inc.*, 223 F.Supp.2d 1, 7–8 (D.D.C.2002); *Consumers Produce*, 16 F.3d at 1383 n. 6. If the merchant fails to meet his obligations under the trust, the PACA trust "gives unpaid suppliers . . . priority over secured lenders" in proceeds from the sales of their commodities. *Albee II*, 155 F.3d at 615.

■ In this case, Plaintiffs, unpaid PACA-protected suppliers, claim that a third-party institution, KCB, participated in a merchant's breach of the PACA trust, and thus is liable to them for the amount that it accepted from trust funds. PACA does not provide explicit remedies against third parties that receive trust assets in breach of a PACA trust, but courts have used general trust principles in determining whether a party has breached or participated in a breach of a PACA trust. *See id.; C.H. Robinson Co. v. Trust Co. Bank, N.A.*, 952 F.2d 1311, 1313–14 (11th Cir. 1992); *Endico Potatoes*, 67 F.3d at 1067–68. Under general trust principles, third parties can be held liable for participating in a trustee's breach of trust. Courts have routinely considered whether banks that have accepted PACA trust money as loan payments from trustee merchants are liable to PACA protected suppliers. *See generally, Fresh Kist Produce*, 223 F.Supp.2d at 1; *C.H. Robinson*, 952 F.2d at 1311; *Endico Potatoes*, 67 F.3d at 1063.

### III. PLAINTIFFS PERFECTED THEIR PACA TRUST RIGHTS

■ Although a PACA protected trust is automatically created upon a merchant's receipt of perishable produce, PACA requires produce suppliers to perfect their rights in this trust. In 1988, when Plaintiffs would have been required to perfect their PACA rights, PACA stipulated that a supplier would waive its PACA rights unless it

[gave] written notice of intent to preserve the benefits of the trust to the commission merchant, dealer, or broker and . . . filed such notice with the Secretary [of Agriculture] within thirty calendar days (i) after expiration of the time prescribed by which payment must be made, as set forth in regulations issued by the Secretary, [or] (ii) after expiration of such other time by which payment must be made, as the parties have expressly agreed to in writing before entering the transaction. . . .

7 U.S.C. § 499e(c)(3) (1988); *see also Bronia, Inc. v. Ho*, 873 F.Supp. 854, 857

(S.D.N.Y.1995). A supplier, in other words, must notify in writing both the Department of Agriculture and the merchant of its intent to preserve PACA benefits within certain time horizons. *In re Marvin Properties, Inc.*, 854 F.2d 1183, 1186 (9th Cir.1988) (holding that PACA "clearly requires the seller to give written notice directly to the buyer").

■ Unless otherwise agreed, the term of payment referenced in section 499e(c)(3) is ten days. 7 C.F.R. § 46.2(aa)(5); *see Bronia*, 873 F.Supp. at 857; *A & J Produce Corp. v. CIT Group/Factoring, Inc.*, 829 F.Supp. 651, 654 (S.D.N.Y.1993). Parties may agree to shorter or longer terms, but if a supplier agrees to a term longer than thirty days, that supplier forfeits its right to PACA trust protection. 7 C.F.R. § 46.46(f)(1), (f)(2); *see also A & J Produce*, 829 F.Supp. at 654. Thus, unless the parties enter a written agreement stating otherwise, the standard statutory and regulatory time period for notification of intent to preserve PACA trust benefits is forty days.[4]

■ Plaintiffs must, therefore, establish that they timely notified both the Department of Agriculture and Shalom within this forty day period. KCB does not contest that Plaintiffs gave notice of intent to preserve trust benefits to the Department of Agriculture.[5] It does contest that Plaintiffs timely notified Shalom by mail. The Second Circuit has indicated that under New York law, the mailing of a letter creates a presumption of receipt by the addressee. *Bronia*, 873 F.Supp. at 859 (citing *Meckel v. Continental Resources Co.*, 758 F.2d 811, 817 (2d Cir.1985)). A party can produce evidence of mailing "either by offering the testimony of the person who actually mailed the letter or through indirect evidence such as proof that the mail was sent through office procedures followed in the regular course of business." *Id.* (citing *Capital Data Corp. v. Capital National Bank*, 778 F.Supp. 669, 675 (S.D.N.Y.1991)). In this case, fourteen of the Plaintiffs presented witnesses who testified to standard office procedure whereby they sent notices to the Department of Agriculture and to the al-

**4.** While KCB argues that Plaintiffs waived their rights to PACA benefits by orally agreeing with Shalom to payments longer than the thirty day maximum time period prescribed by the statute, KCB presented no evidence that this was the case for one or more of the Plaintiffs. Even if KCB had demonstrated that certain Plaintiffs allowed payment terms in excess of thirty days, any such oral agreements, or "courses of dealing," are insufficient to modify the statutory and regulatory payment term of ten days. *A & J Produce*, 829 F.Supp. at 655. Any such extensions must be made in writing as required by the statutory language. *Idahoan Fresh v. Advantage Produce, Inc.*, 157 F.3d 197, 204 (3d Cir.1998) (holding that "[t]he plain language of the statute and regulations requires that an agreement establishing 'prompt payment' period other than that established in the regulations must be in writing"). Unless there is a written agreement, suppliers "[retain] the

right to demand payment within ten days and seek trust protection under PACA." *Hull Co. v. Hauser's Foods, Inc.*, 924 F.2d 777, 782 (8th Cir.1991). As no evidence of a written agreement was presented at trial, the applicable time period available to the suppliers in this case remains forty days—the ten day payment term plus the thirty day period for notification.

**5.** Plaintiffs did send invoices to the Department of Agriculture that included claims for payments beyond the forty day statutory and regulatory period. The Department of Agriculture certified only those invoice claims for payment within the forty day statutory and regulatory time period, excluding any claims for payment reaching beyond this time. (Plaintiffs Exs. 1.1–1.23, 9). The Plaintiffs' claims for payments reflect only the amount calculated by the Department of Agriculture.

legedly defaulting merchant.[6] These witnesses were in positions of authority during the time that the PACA notices would have been sent and testified to the procedures used by those under their supervision.[7] (Tr. 162–63, 185, 204–205, 221–22, 245, 250, 263–65, 277–78, 295–296, 306–307, 433–34, 446–50, 456–57, 462, 469–70, 472–73, 486–487). Based upon this testimony, the Court finds that these fourteen Plaintiffs routinely sent the merchant notifications at the same time as they sent the Department of Agriculture notices.

Plaintiffs corroborated this testimony with the certified copies of the Department of Agriculture's receipts of notice of intent. Each Plaintiff submitted certified copies of PACA notices that the Department of Agriculture received, along with the invoices that Plaintiffs submitted to the Department of Agriculture in support of their claims. (Plaintiffs Exs. 1.1—1.23). *See Bronia,* 873 F.Supp. at 860; *see also In re East Coast Brokers and Packers, Inc.,* 961 F.2d 1543, 1545–46 (11th Cir.1992) (finding that although no first hand testimony was offered, testimony as to standard office procedures in addition to certified copies of PACA notices was sufficient to show that notification was given to merchant).

In addition, the Court notes that Young Ok Lee ("Lee"), Shalom's principal, does not deny receipt of the notices. In fact, Lee testified that while he could not remember specific dates, he did receive PACA notices in October of 1988, by hand and mail. (Tr. 54, 95). Moreover, Lee did not dispute the amount of the claimed debts, but instead held a meeting with all the suppliers who made claims against him in which he agreed to collect account receivables to satisfy their claims. (Tr. 52, 54, 95). The Court finds Lee's testimony on this issue credible and notes that KCB did not produce any evidence that Lee ever challenged the Plaintiffs' timely notification of Shalom, even when it would have been in his interest to do so when he was still the principal of Shalom and attempting to keep his company afloat. Lee's actions through the time of the trial are consistent with his believing the PACA claims to be valid. Accordingly, the Court finds Lee's testimony corroborative of Plaintiffs' claims that they timely notified Shalom and finds that the fourteen Plaintiffs who offered testimony have met their burden of proving that they gave timely notice to Shalom.

In one case, KCB did provide affirmative evidence to rebut Plaintiffs' evidence that it filed timely notice with Shalom. In this case, Hunts Point Tomato Co, Inc. ("HPT") filed its notice of intent with the Department of Agriculture on October 7, 1988 for the amount of $19,618. (Plaintiffs Ex. 9). The notice of intent included deliveries going back more than 40 days to August 18, 1988 through August 22, 1988. (Plaintiffs Ex. 1.10). Consequently, the

**6.** The fourteen Plaintiffs are: Rubin Bros. Produce; Finest Fruits, Inc.; Kleiman & Hochberg, Inc.; Craig–Ann Produce, Inc.; D'Arrigo Bros. Co., Inc.; L & K Tomatoes, Inc.; Square Produce, Inc.; Wishnatzki & Nathel, Inc.; Hunts Point Tomatoes; Krisp-Pak Sales Corp.; E. Armata, Inc.; M & R Tomatoes Distributers, Inc.; Fierman Produce Exchange, Inc.; and Albee Tomato Co., Inc.

Thirteen witnesses testified, with one witness testifying on behalf of both L & K Tomatoes and Square Produce. (Tr. 279–280).

**7.** One witness testified on behalf of both M & R Tomato Distributors, Inc. and M & R Trading Co. (Tr. 456–57, 462). Her testimony as to office procedure was sufficient with respect to M & R Tomato Distributors as she was in a position of authority at the time the notices were sent (Tr. 456–57); however, her testimony is insufficient with respect to M & R Trading Co. because she was not employed at this company at the time that the notices were sent and because she could only testify as to her belief regarding the procedure for delivery of PACA notices. (Tr. 463).

Department disallowed the claims prior to August 31, 1988 because they did not fall within the forty day minimum notification requirement, leaving a total of $18,242 in debt. However, HPT's certified mail receipt for delivery of notice of intent to Shalom shows that Shalom did not receive the notice until October 12, 1988, five days after the Department of Agriculture received it. (Plaintiffs Ex. 28). The Court finds that in the case of "HPT," KCB rebutted the Plaintiffs' evidence of timely notification. Accordingly, Plaintiffs' Hunt Points Tomato claimed damages are reduced by $6,266, the amount HPT claimed during those five days, to a total of $883,983.17.

▪ As to the other nine Plaintiffs who did not offer testimony to support their claims of timely notification, the Court finds that they failed to meet their burden of showing timely notice.[8] The submission of certified notices to the Department of Agriculture and Lee's testimony is insufficient to support a finding that they met their burden under PACA. The fact that the Department of Agriculture received notification of intent to preserve PACA benefits, without any evidence that a notice was also sent to the merchant, does not confirm that Shalom received any notice, let alone timely notice. Lee could confirm that he received notices from suppliers, but was unable to confirm which suppliers sent notices or that these notices were timely sent. (Tr. 60–75, 95). Because of Lee's lack of specificity, the nine

Plaintiffs cannot rely exclusively on his testimony as opposed to their own submissions to meet their burden. *See Bronia,* 873 F.Supp. at 857–58 (dismissing the claims of plaintiffs that did not participate in the hearing on whether the merchant received notice). Thus, the claims of these nine plaintiffs—R & C Communale, Inc., Costa & Harris, Inc., G & B Produce, Inc., L & P Fruit Corp., Morris Okun, Inc., M & R Trading Co., H. Schnell & Co., Inc. Martin Stricks & Sons, Inc., and Vita–Wellbrock–Kearney, Inc.—are dismissed. This reduces Plaintiffs claimed damages by $222,244.80 to $661,338.37.[9]

## IV. PLAINTIFFS PROVED AMOUNTS OWED

▪ To support their claim for $661,338.37 as the amount of goods sold and delivered to Shalom, all fourteen Plaintiffs testified to their recollections of the amount Shalom owed, largely in reliance on invoices that they submitted to the Department of Agriculture reflecting the amount owed.[10] (Plaintiffs Exs. 1.1—1.23, 9). In addition, Lee testified that when Shalom received a notice of intent to preserve trust benefits from a supplier along with the relevant invoices, Shalom would check the invoice against its own records. Lee recalls that the submitted notices and invoices matched Shalom's records. (Tr. 55–56). As explained above, at no point did Lee dispute the claims that the PACA suppliers were making against him, neither while he was still the president of Shalom nor thereafter.[11] Lee's testimony

---

8. The eight non-testifying Plaintiffs are: R & C Communale; Costa & Harris, Inc.; G & B Produce, Inc.; L & P Fruit Corp.; Morris Okun, Inc.; H. Schnell & Co., Inc.; Martin Stricks & Sons, Inc.; and Vita–Wellbrock–Kearney, Inc. As mentioned in footnote 7, M & R Trading Co. did offer a witness to testify as to her belief of the company's procedures. Since she was not at the company at the time the notices were sent, the Court does not consider her testimony to be reliable.

9. This figure includes the deduction for the Hunts Point Tomato claim.

10. From herein, when the Court refers to "Plaintiffs," it is referring to the fourteen remaining Plaintiffs.

11. KCB points to Lee's 1994 affidavit that stated Shalom owed Plaintiffs $920,000 and a later statement in 1999 in which he stated that the debt was $800,000. (Tr. 96). KCB

and actions during the time that he was receiving these notices support the accuracy of the notices and their supporting invoices.

▮▮▮ The Court rejects KCB's argument that negative inferences should be drawn from Plaintiffs' failure to provide further evidence—beyond their recollection and the invoices attached to the Department of Agriculture notices—such as account receivables or office records.[12] The Court finds that Plaintiffs discarded such records several years after they made their PACA claims in the normal course of business. (Tr. 175–78, 213, 228–229, 254–55, 269, 287–88, 301, 312–313, 439–440, 452, 465, 475–76, 491). For example, one witness, the witness for Rubin Brothers, testified that he was not sure whether he retained any records with regard to 1988, but that if he had discarded Shalom's, he would have discarded the records for all customers from that year in an effort to conserve space. (Tr. 176–77). KCB presented no evidence to show that Shalom found inaccuracies in the invoices or that these invoices did not already reflect necessary adjustments for returned produce. *See, e.g., Havana Potatoes of New York Corp. v. United States*, 136 F.3d 89, 92 (2d Cir.1997) (noting that the "lack of evidence undermining" the invoices was relevant to

determining whether the dates of invoices were valid). The Court, therefore, credits the Plaintiffs' assertions that the amounts claimed to the Department of Agriculture were accurate.

## V.  BONA FIDE PURCHASER DEFENSE

### A.  The Legal Standard

▮▮ Having determined that the fourteen remaining PACA suppliers met their burden under the PACA trust requirements and have shown that they are indeed owed the amount they claim, the Court turns to whether Plaintiffs can enforce their PACA trust claims against the Bank as a third-party transferee in breach of the trust. The Bank maintains that although trust law permits it to be held liable as a third-party transferee, it met its burden of establishing at trial that it was a bona fide purchaser. In establishing the protected status of a bona fide purchaser, KCB, as transferee, bears the burden of proof. *Albee II*, 155 F.3d at 615. "A third-party transferee may escape liability ... if it: (i) gave value for the trust property and (ii) had no actual or constructive notice of the breach of trust." *Id.; see Restatement (Second) of Trusts § 284(1)* (explaining that a "person who takes for

---

argues that this shows that Lee did not know the true amount he owed. The Court credits Lee's explanation that his confusion as to the total amount owed was due to the fact he had turned over his account receivables to the Produce Association. (Tr. 96–97). While Lee did not know offhand the amount Shalom owed, Lee's testimony was clear enough to establish that he believed the PACA claims to be accurate.

12. KCB argues that Plaintiffs' destruction of documents amounts to spoliation of evidence and as such may give rise to an inference that the evidence would have been unfavorable to Plaintiffs. *See Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir.2001);

West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir.1999). Under the Second Circuit's standard, "[t]he burden falls on the 'prejudiced party' to produce 'some evidence suggesting that a document or documents relevant to substantiating his claim would have been included among the destroyed files.' " *Byrnie*, 243 F.3d at 108 (quoting *Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir. 1998)). KCB has not offered sufficient evidence to suggest that Plaintiffs' documents included information other than what was listed in the invoices turned over to the Department of Agriculture. Furthermore, the Court finds no evidence that Plaintiffs acted in bad faith when disposing of their records. *See, e.g., id.* at 107–108.

value and without notice of the breach of trust, and who is not knowingly taking part in an illegal transaction," shall hold title to the interest free of liability to the trust beneficiary).

While a transfer of trust assets to satisfy a pre-existing debt is generally not for value, an exception lies where the lender accepts a negotiable instrument or money. *Id.* at § 304. This "money transfer" exception exists so that lending institutions are not burdened to discern in each case whether a negotiable instrument or money offered to satisfy a debt is beholden to a trust. *C.H. Robinson Co. v. Trust Company Bank, N.A.*, 952 F.2d 1311, 1314 (11th Cir.1992) (quoting *Restatement (Second) of Trusts § 304(2)*). The Second Circuit, however, noted that KCB may not have the benefit of the money transfer exception if it was on notice of a breach of trust by Shalom. *Albee II*, 155 F.3d at 616.

As to the issue of notice, in a standard breach of trust case, a court would consider the following standard in determining whether a breach of trust had occurred:

> [a] transferee should know of a breach of trust when "he [or she] knows facts which under the circumstances would lead a reasonably intelligent and diligent person to inquire whether the trustee ... is committing a breach of trust, and if such inquiry when pursued with reasonable intelligence and diligence would give him [or her] knowledge or reason to know that the trustee is committing a breach of trust."

*Id.* (quoting *Restatement (Second) of Trusts § 297, cmt. a)*. The Court of Appeals held, however, that this case was unusual in that the evidence presented on appeal demonstrated that Shalom had "self-evident cash flow problems." [13] *Id.* at 617. The Court of Appeals stated that on this evidence, KCB could not defeat the PACA suppliers claims on a motion for summary judgement and that, in fact, it had a higher burden to establish a bona fide purchaser defense. The Court of Appeals adopted the following test:

> Where ... [a] PACA trustee has self-evident cash-flow problems, a lender ... must make the kind of inquiry as to debts owed by the trustee to PACA beneficiaries that a reasonably prudent lender would make as to debts owed by a similar borrower to a prior creditor who had rights superior to those sought by the lender.

*Id.* The concern in this case is that KCB ignored important signals that Shalom faced financial difficulties, namely serious cash-flow problems. If KCB knew or should have known of Shalom's financial difficulty, it should have been cautious— under the prudent lender standard—and ensured that prior creditors were being paid. Thus, the Court must look to whether the facts presented at trial demonstrate that Shalom suffered self-evident cash-flow problems and yet KCB failed to conduct a proper inquiry under this heightened standard.

### B. Self–Evident Cash Flow Problems

Shalom first sought and obtained an overdraft account with KCB in July of 1986. (Plaintiffs Ex. 4). At that time, KCB authorized a credit limit for the overdraft account of $120,000, whereby KCB would honor Shalom's withdrawals up to that limit and KCB would accept deposits that Shalom made to the account as automatic payments toward reduction of any

---

13. As factors in making its determination that Shalom, the PACA trustee, had self-evident cash flow problems, the Court of Appeals noted, among other things, that Shalom submitted unaudited financials and that it "consistently had a negative balance that frequently exceeded the overdraft privilege." *Albee II*, 155 F.3d at 617.

overdraft that Shalom undertook. (Plaintiffs Exs. 4, 5A; Tr. 359–361, 400). In its application to the Bank, Shalom reported that any necessary payments toward reduction of an overdraft balance would come from the company's earnings. (Plaintiffs Ex. 4). Although it did not explicitly state that these earnings would be from the sale of produce it had bought from produce suppliers, the Bank knew that deposits into the account consisted of proceeds from Shalom's sale of produce. (Tr. 397, 400). The Bank secured this account with an $80,000 certificate of deposit, a mortgage on Lee's residence worth $40,000, and personal guarantees from Lee, his wife, and other parties. (Plaintiffs Exs. 17, 18, 20–22; Tr. 364–66).

However, within its first year, Shalom continuously exceeded its $120,000 credit limit, so much so that the Bank collected the $80,000 deposit from Shalom and reduced its "nominal" line of credit to $40,000. (Tr. 371–72, 552, 622). Shalom did not honor KCB's credit limit in 1987 any more than it had in 1986, and, in fact, abused its $40,000 limit to a far greater degree. It continually incurred daily negative balances anywhere from $100,000 to $300,000. (Plaintiffs Exs. 40–51). Shalom completed the months of August, September, October, and December of 1987 with overdrafts, respectively, as follows: $214,951.62, $291,395.01, $221,534.29, and $367,252.24. (Plaintiffs Exs. 47–49, 51).

In 1988, the year of the breach, Shalom's overdraft account was in extreme arrears, offering a clear red flag to KCB that Shalom was having significant difficulty controlling its cash-flow. Indeed, for the six months before the August of 1988 breach, Shalom consistently maintained overdraft balances in the $200,000, $300,000 and $400,000 ranges. (Plaintiffs Exs. 31–35). In February and March of 1988, Shalom's negative balance rarely went below $300,000 and often hovered in the $400,000 and $500,000 ranges. (Plaintiffs Exs. 32–33). In one of its most egregious patterns of abuse of the overdraft, Shalom closed March 7th with an overdraft of $515,091.4,[14] March 8th with $535,514.27, March 9th with $559,080.94, and March 10th with $530,942.26 (Plaintiffs Ex. 33). Shalom closed out the month of March with a negative balance of $334,262.94. (*Id.*).

In April of 1988, Shalom did manage to reduce the overdraft to under $300,000 on all but five days and Shalom completed the month with an overdraft of $189,233.14, one of its lowest since June of the previous year. (Plaintiffs Ex. 34). In May, Shalom's statement reflected a similar pattern, closing with a negative balance of $246,781.99. (Plaintiffs Ex. 35). Still, Shalom's negative balance remained between $200,000 and $300,000 for most of these two months, far in excess of the $40,000 nominal credit limit, let alone the original $120,000 overdraft agreement.

Significantly, in June of 1988, when Shalom was facing renewal of its overdraft account, Shalom managed to reduce its overdraft to $26,021.37. (Plaintiffs Ex. 36). In July, Shalom also honored KCB's credit limit to a greater extent than it had during the spring of 1988. (Plaintiffs Ex. 37). In July, Shalom applied for and received a renewed overdraft agreement with KCB, this time with a credit limit of $150,000.[15] (Plaintiffs Exs. 5A, 5B). Additionally, in August and September of 1988, when Shalom defaulted on its payments to suppliers, Shalom consistently maintained negative balances closer to the credit limit. (Plaintiffs Exs. 12–13).[16]

---

**14.** The one-hundredth of this dollar amount is illegible.

**15.** This amount was further secured by an additional mortgage on Lee's personal residence. (Plaintiffs Ex. 7).

**16.** Shalom's records of its KCB account re-

There is also no doubt that KCB should have recognized Shalom's cash-flow problems. KCB issued monthly statements to Shalom detailing Shalom's credits and debits for each transaction. Whenever an overdraft account exceeded its line of credit, the Bank would automatically generate and issue a "not sufficient funds report" or an "NSF" that would contain the same debit and credit information as the bank statements sent to Shalom. (Tr. 341, 344). This NSF would be reviewed by the person overseeing the overdraft accounts, generally the deputy manager, as well as a loan clerk. (Tr. 341–42). Furthermore, KCB had access to Shalom's financial information, showing that Shalom had severe liquidity restrictions. In July, the month before Shalom began to breach the trust, KCB undertook a review of Shalom's finances. (Plaintiffs Exs. 7, 15; Tr. 601). It reviewed the company's unaudited statements regarding assets and liabilities, gross sales, liquidity, and profit margins. (Plaintiffs Exs. 7, 15; Tr. 377, 388–91, 532). This information could not have reassured KCB about Shalom's cash flow, as Shalom showed a net profit margin of only 0.1% in 1987 and only 0.3% in 1988. (Plaintiffs Ex. 7).

Indeed, the Bank's own actions toward Shalom demonstrate that it was concerned with Shalom's continual abuse of the overdraft account. Throughout 1987 and 1988, KCB pressed Lee to reduce the overdrafts to within the authorized credit limit. In November of 1987, it was concerned enough to assist Lee in developing a plan to reduce its debt with the bank, which included (a) improving receivable collection procedures by initiating legal proceedings on 108,000 delinquent accounts, (b) urging an additional investment by Lee, and (c) acquiring additional financing from another bank. (Tr. 596–597). In December of 1987, the Bank sent Lee a sharply worded letter in which KCB's General Manager noted that the Bank had repeatedly asked Lee to clear the overdraft "sooner or later" and stated that "unless . . . [Shalom paid] off the overdrawn amount in five business days after" receipt of the letter, Shalom's account would be closed. (Plaintiffs Ex. 5B). The Bank continued to speak with Lee throughout 1988 with respect to improving the account's negative balances and Lee continued to reassure KCB that Shalom had a plan to do so. (Plaintiffs Ex. 23). KCB's efforts demonstrate that it was aware of and concerned by Shalom's cash-flow problems.

The Court rejects the expert testimony of Edward McNally that Shalom's overdraft balances were not a red-flag to the Bank of cash flow problems.[17] (Tr. 328). Although McNally is a qualified expert on loan evaluation and prudent lender practice based on his extensive years in the banking field, the Court is not persuaded by his testimony.[18] McNally testified that,

flect that payments to produce suppliers cease on or about September 13, 1988 and do not resume again until on or about November 2, 1989, the month after Plaintiffs made notification to Shalom of its intent to preserve PACA benefits. (Defendant Ex. J).

17. Jong Won Choi, a vice-president at the Bank, also testified that Shalom's overdraft balances were not evidence of a cash flow problem. He had no personal knowledge of Shalom during 1987 or 1988, but posited that the overdraft balance would not have been so large had the credit limit been increased sooner. (Tr. 403). The Court rejects this testimony as a credible explanation for Shalom's large and persistent overdrafts.

18. McNally was a loan officer in the bank industry from 1965 through 1991. (Tr. 569). He was a lending officer for two banks, Central Penn National Bank in Philadelphia and Philadelphia National Bank. (Tr. 570). He then served as a manager of lending officers for National Westminster Bank from 1979 through 1991. (*Id.*). After that, he served as a management consultant for financial services companies, including banks. (Tr. 569). He took finance courses at, but did not receive a degree from, the Wharton School of

based on his review of Shalom's bank statements, KCB had no reason to be alarmed and that the "normal situation would be for [Shalom] to be in a negative balance." (Tr. 625). McNally did not explain, though, whether he meant it was "normal" to be in excess of the negative balance permitted by the overdraft contract or "normal" to use the negative balance available under the contract. He did explain that a bank such as KCB would not be alarmed by the amount of an overdraft account balance during the course of one day or even at the end of one day if the excessive overdraft were reduced the following day. (Tr. 593). McNally's explanation, however, does not explain how a Bank would not be alarmed by overdrafts consistently hundreds of thousands of dollars over the overdraft limit for days, if not months, on end. His testimony with respect to normal overdraft procedure simply does not fit the facts of this case, and even he admitted that Shalom's account in March of 1988, when it reflected overdrafts in the amount of $500,000 over the course of several days, was "disturbing."[19] (Tr. 623).

Certainly, a reasonable bank officer looking at the overdraft account numbers should have been concerned that Shalom did not have sufficient funds to cover its operating expenses, its debts to its suppliers, and its debt to the Bank. Based on the overdrafts account statements, the Court finds that Shalom had self-evident cashflow problems and that the Bank was well aware of them. As such, KCB was on notice of Shalom's financial distress and, as the Second Circuit explained, should have been prompted to investigate whether Shalom was satisfying its obligations to prior creditors, or PACA suppliers, before automatically deducting deposits against Shalom's overdraft to better its own position.

## C. The Second Circuit's "Reasonably Prudent Lender" Standard

As explained earlier, the Court must determine whether KCB took steps that a "reasonably prudent lender would make as to debts owed by a similar borrower to a prior creditor who had rights superior to those sought by the lender." *Albee II*, 155 F.3d at 617. The Bank argues that it satisfied the Second Circuit's standard when it reviewed Shalom's financial information vigorously enough to satisfy itself that Shalom was worthy of renewed and enlarged overdraft protection in both 1988 and 1989.[20] KCB notes that, based on this review, it had no warning of Shalom's default and that it, like the unpaid PACA suppliers, still has a claim against Shalom for the unpaid balance of the overdraft account in the amount of $151,126.54—

---

Business. (Tr. 569–70, 633). In preparation for his testimony, he reviewed Plaintiffs' exhibits 2, 3, 5A, 5B, 6, 7, 8, 11, 12, 13, 14, 15, 16A, 16C, 17, 18, 20, 21, 22, 23, 29, 31–37, 40 51, and AN, and Defendant's exhibits AP, AQ, AR, AN, AS, and AX. (Tr. 577–583).

19. A far more credible assessment was made in 1989 by one of KCB's senior loan officers who submitted a report to KCB in connection with Shalom's application for a renewed overdraft account. The loan officer concluded that "[a] comprehensive and reasonable financial analysis [could not] be accomplished because the financial statements presented cover different periods," making "comparisons and ratios" meaningless. (Plaintiffs Ex.

16C). He further wrote that Shalom's "net profit margin of one tenth of one percent on sales" over $10,000,000 was unacceptable. (*Id.*). Finally, he stated that "[t]he cash flow and net profit from the operation would indicate an almost impossible task for the borrower to reduce or payoff the entire overdraft line of credit in the foreseeable future." (*Id.*).

20. KCB points to its review of Shalom's unaudited financial statements, accounts receivable lists, accounts payable lists, oversight of Shalom's overdraft and regular communication with Shalom's principal, Mr. Lee, including visits to Shalom and oversight of Lee's personal finances. (Tr. 601; Plaintiffs Ex.5B, 7, 8, 23; Defendant Exs. AO, AN, AP).

Shalom's negative balance the day that KCB was informed of Plaintiffs' lawsuit and froze Shalom's account.

The Court is not persuaded by the Bank's evidence that it performed the inquiry that a reasonably prudent lender would have performed as to a prior creditor. The fact that the Bank was sufficiently satisfied with its own review of Shalom's financials to offer Shalom an extension on its overdraft account does not convince this Court that KCB performed the kind of inquiry required under the Second Circuit's standard. That the Bank may have been confident enough to offer another loan, one which was secured by Shalom's accounts receivables and property and a mortgage in Lee's property, does not necessarily mean that the Bank should have been confident as to Shalom's ability to meet its obligations to prior creditors. As the Second Circuit stated, an analysis of credit risk is not the same analysis as whether a debtor is meeting its obligations to a prior creditor. *Albee II*, 155 F.3d at 617.

Taken as a whole, the evidence shows that the inquiries the Bank did make into Shalom's financial stability were inadequate to reveal whether Shalom could satisfy its debts to prior creditors. Significantly, despite the fact that Shalom had self-evident cash-flow problems, KCB continued to accept Shalom's unaudited financials and lists of accounts payable and receivable without aging information. While it may not have been customary to force smaller companies to submit audited financials, (Tr. 377–379, 382, 616), it would

have been reasonable and prudent for the Bank to require some form of third party review of Shalom, considering the state of Shalom's financials.

For example, in *Consumers Produce Co. v. Volante Wholesale Produce, Inc.*, the Third Circuit thought it important that the bank in that case, which it found to be a bona fide purchaser, had reviewed both unaudited quarterly financial statements as well as "annual financial statements prepared and reviewed by an independent certified account." 16 F.3d 1374, 1384 (3d Cir.1994). Likewise, even McNally discussed the importance of knowing the age of accounts payable and receivable in determining cash-flow. (Tr. 589–641). Nonetheless, KCB conducted financial analyses of the company based on Shalom's unverified submissions. (Plaintiffs Exs. 5, 15; Defendant Ex. AN).

Rather than verify the numbers that Shalom submitted, KCB placed a great deal of faith in Lee, Shalom's principal. For example, McNally reported that the Bank "placed a lot of reliance on the fact that they knew this individual well and placed a lot of reliance on his character, in their assessment of his character." (Tr. 601). Furthermore, the Bank's loan offering sheets of 1988 focus to a large extent on Shalom's position in the Hunts Point community and Lee's capable management. (Plaintiffs Ex. 7). While these characteristics of Shalom might be worthy of the Bank's attention, they do not obviate the need for the Bank to have conducted an inquiry into Shalom's obligations to prior creditors, nor are they, in and of themselves, any verification of Shalom's dealings with creditors in general.[21]

---

21. In relying solely on the submissions of Lee on behalf of Shalom, the Bank ignored the potential that Lee might misrepresent the company's financial information because of his personal stake in the company. In fact, there is evidence that Lee misrepresented his financial situation to the Bank in 1989 when he reported account payables as $284,000, while omitting the fact that he was being sued for over one million dollars. (Plaintiffs Ex. 8). KCB maintains, based on the fact that Lee submitted false information to them in 1989 and may have done so throughout his tenure at Shalom, it should be afforded the protection of bona fide purchaser status. KCB points to *Consumers Produce*, where the Third Circuit found that the bank was a bona

Furthermore, the unaudited financial information that KCB did have could not have reassured it that Shalom was in a strong enough financial position to pay prior creditors. For example, Shalom's unaudited income statements showed a profit for fiscal year 1986 of only $10,956 before taxes; profits for fiscal year 1987 of $14,485 before taxes; and profits for eight months of fiscal year 1988 of $40,414 before taxes. (Defendant Ex. AN). With such minimal profit, the Bank should have been deeply concerned that Shalom would not have been able to pay off its suppliers or the Bank itself for that matter.

Another factor demonstrating the Bank's failure to perform a prudent inquiry was its decision not to complete any credit checks as to prior creditors. While this may have been because the Bank was not aware that under PACA it had a duty to creditors, this ignorance of the statute does not excuse the Bank from its burden. *Albee II*, 155 F.3d at 615. In *E. Armata, Inc. v. David Lee's Produce Service Corp.*, the district court found that, unlike the situation here, the defendant bank, also KCB, had completed an appropriate inquiry into the trustee merchant's outstanding debts. 2002 WL 31834451, at *6. In that case, however, KCB had

> made [an] independent inquiry into [the merchant trustee's] outstanding debts by confirming with national credit agencies that no claims were made against the company. KCB obtained reports from the two national credit rating agencies (TRW and Dunn and Bradstreet), which are standard tools that a reason-

ably prudent lender would make to identify any prior creditors.

*Id.* In the case at bar, KCB offered no evidence to show this Court that it inquired into prior creditors' claims to determine whether Shalom's suppliers were being paid.

Finally and importantly, the Bank responded to Shalom's abuse of its overdraft limit by encouraging Shalom, and, at points, demanding that Shalom increase the rate of collection of account receivables. (Tr. 405, 596–97; Plaintiffs Ex. 23). KCB did this while fully aware that the deposits that Shalom was making to the account were from accounts receivable and that Shalom's ability to reduce its overdraft was dependent on collection of these accounts receivable. As KCB pressured Shalom to reduce its overdraft, it had to have been aware of the likelihood that Shalom was forgoing payments to suppliers in order to reduce its overdraft.

Indeed, the facts reveal that this is exactly what occurred. KCB put a great deal of pressure on Shalom to improve its account with the Bank. The log shows numerous occasions on which the Bank informed Lee that he needed to improve his account balances. (Tr. 405, Plaintiffs Ex. 23). In the loan offering sheets, KCB made clear that it was continuing its loan to Shalom based on Shalom's promise to accelerate collection of accounts receivables. Not surprisingly then, in June of 1988, the very month before Shalom was up for renewal of the overdraft account, it suddenly managed to reduce its negative

---

fide purchaser because the PACA trustee merchant had concealed its "failure to pay produce suppliers and [its] financial difficulties." 16 F.3d at 1384. *Consumers Produce* is distinguishable because the bank in that case required the merchant, among other things, to pay all liabilities when due and notify the bank of any material litigation and submit annual audited reports. *Id.* Furthermore, the

Third Circuit credited the testimony of the expert witness who reported that there were no red flags to alert the bank of any problem. *Id.* Here, Shalom's self-evident cash-flow problems were adequate notice, in and of themselves, to cause the Bank to inquire as to Shalom's potential breach of trust to its suppliers, regardless of the misleading submissions to the Bank.

monthly balance from $246,781.99 in May of 1988 to $26,021. 37. (Plaintiffs Exs. 35–36).

Lee also testified that in August and September of 1988, KCB became firm with him, bouncing checks that he was writing and explaining to him that it would not permit him to continue exacting large overdrafts from the account. (Tr. 47–48). At this same time, on September 13, 1988, Shalom's check book from the KCB account shows that Shalom stopped making payments to suppliers. (Defendant Ex. J). Checks made from the account from September of 1988 through October of 1989 show withdrawals from the account for payroll, leases and phone bills, taxes, and other business operating expenses, but few, if any, payments to suppliers. (Defendant Ex. J). It was also in October of 1989, when Shalom reinitiated payments to suppliers, that Shalom began to again routinely exceed its overdraft limit at KCB. (Defendant Ex. AS). It appears, therefore, that Shalom was able to reduce its overdraft debt at the bank precisely because it continued to divert money from PACA protected suppliers. Certainly, the Bank, if it had been concerned about prior creditors, should have checked to make sure that those prior creditors were being properly paid. The evidence demonstrates, therefore, that KCB was "aware of facts under the circumstances which indicate that suppliers are not being paid or that the trustee has insufficient assets to both make the transfer and pay suppliers." [22] *Consumers Produce*, 16 F.3d at 1383 n. 6. Accordingly, the Court finds that KCB was on notice throughout the breach period—from August of 1988 through January of 1990—of Shalom's financial distress because of Shalom's self-evident cash flow problems and that KCB failed to conduct the kind of inquiry that a reasonable lender would make as to prior creditors.

## VI. DAMAGES

The Court turns next to the issue of damages and to what degree KCB must disgorge the payments it accepted in breach of the PACA trust. Significantly, although the funds deposited in Shalom's account were used to reduce the overdraft, most of the payments that Shalom made from its account went back out to its produce suppliers. (Tr. 49; Defendant Ex. J). Obviously, these funds were not used for an improper trust purpose but were, rather, used to facilitate payments to PACA beneficiaries by bridging the time gap between payments due to suppliers and Shalom's collections of account receivables from retailers. This case is analogous to *Boulder Fruit Express & Heger Organic Farm Sales v. Transportation Factoring, Inc.*, where the Ninth Circuit explained that a trustees' decision to obtain cash in return for accounts receivables

> for fair value is entirely consistent with the trustee's primary duty under PACA ...—to maintain trust assets so that they are "freely available to satisfy outstanding obligations to sellers of perishable commodities." The goal of PACA, after all, is not the perpetuation of unliquidated commercial paper, but to assure that growers are paid for their commodities.

251 F.3d 1268, 1271 (9th Cir.2001), *cert. denied,* 534 U.S. 1133, 122 S.Ct. 1077, 151 L.Ed.2d 978 (2002) (citing H.R.Rep. No.

---

22. The Court notes that this language was used in assessing whether a third party should be aware of a breach of trust under the ordinary test for breach of trust as opposed to the heightened standard articulated in *Albee II* where there are self evident cash-flow problems. The Court believes that, even under the ordinary analysis, KCB was on notice of a potential breach of trust and failed to conduct a reasonable inquiry into whether or not Shalom was committing a breach of trust.

98–543, at 3 (1983), *reprinted in* 1983 U.S.C.C.A.N. 405, 406); *see E. Armata*, 2002 WL 31834451, at *5 (stating that a "[b]ank's liability is predicated on their having been a breach of trust ... [and where] most of the funds ... deposited into [the merchant debtor's] account at KCB were eventually paid to PACA beneficiaries ... no breach occurred with respect to those funds") (citing *Boulder Fruit*, 251 F.3d at 1272 and *American Banana Co., Inc. v. Republic National Bank of New York, N.A.*, No. CIV.A.99–1330, 2001 WL 1132045, at *3 (S.D.N.Y. Sept.25, 2001)). Therefore, "KCB can only be held liable for the receipt of funds that were eventually used by [the merchant debtor] to pay non-PACA beneficiaries." *E. Armata*, 2002 WL 31834451, at *5. The Court finds that there was no breach of trust for those funds that were deposited into Shalom's account at KCB but used to pay PACA beneficiaries.

Although neither party provided the Court with an accounting of the funds that were paid from Shalom's account from the time of Shalom's breach of the trust to the date that KCB froze Shalom's account, the Court has used Shalom's checkbook (Defendant Ex. J) to assess the dollar amount of payments made to non-PACA beneficiaries from August 26, 1988 through January 17, 1990. August 26, 1988 is the first date for which the Department of Agriculture authorized Plaintiffs' claims, and January 17, 1990 is the date that KCB froze Shalom's account.[23] (Plaintiffs Ex. 9; Defendant Ex. AS). The non-PACA entities to which Shalom made payments included, among others: KCB itself for interest and service fees,[24] phone companies, printing and leasing companies, payroll, New York state and the IRS, the Department of Labor, credit card companies, insurance companies, and a merchant association. (Defendant Ex. J). In its calculation, the Court does not include as non-PACA expenditures those proceeds deposits that automatically reduced Shalom's overdraft debt to KCB because the Bank actually extended approximately $60,000 to Shalom in additional credit, which it lost.[25] In sum, then, the Court has calculated Shalom's non-PACA payments during the breach period to be $319,954.94. (Defendant Ex. J). KCB is liable to Plaintiffs for this amount.

KCB argues that it is entitled to equitable defenses of laches, unclean hands, and a failure of Plaintiffs to mitigate damages. KCB claims that by notifying the Bank of the lawsuit against Shalom ten months after it had filed the lawsuit, Plaintiffs were complicit in KCB's breach of the trust. In fact, KCB claims, Plaintiffs benefitted from the continued operation of the overdraft account because they continued to receive checks from it. This argument is unpersuasive since the damage award excludes any payments that KCB made to Plaintiffs. Plaintiffs will not be allowed to recover twice from KCB. The remaining relevant argument is that by their failure to notify the Bank of Shalom's breach of the trust, Plaintiffs have lost claim to those payments made to non-PACA beneficiaries after they filed suit and before they notified the Bank of that suit.

**23.** The Department of Agriculture, as discussed earlier, received claims for dates earlier than August 26, 1988, but this was the first claim that it authorized as valid within the necessary forty day notification period. (Plaintiffs Ex. 9).

**24.** Shalom's checkbook reflected its interest and service fee payments to KCB.

**25.** On August 26, 1988, the first day of the breach, Shalom owed KCB $90,498.42. On January 17, 1990, the day KCB froze the account, Shalom owed it $151,126.54. (Plaintiffs Ex. 11; Defendant Ex. AS).

While the Court notes that Plaintiffs did delay in notifying the Bank of their lawsuit, the Court, in its discretion, finds that equity does not favor the Bank in this case. *See, e.g., E. Armata,* 2002 WL 31834451, at *7. Plaintiffs may have been delinquent to some degree, but KCB was on clear notice of Shalom's cash-flow problems. While Shalom's overdraft balance from March of 1989 through January of 1990 might not have evidenced severe cash-flow problems as it had in other years, (Defendant Ex. AS), the account did exceed the credit limit on numerous occasions. Also, in 1989, the Bank again reviewed Shalom's weak financial information and its own loan officer noted that Shalom's financials were cause for concern. (Plaintiffs 8, 16C, 23). Given the ongoing circumstances of the overdraft account and Shalom's utter failure to explore whether Shalom was meeting its obligations to suppliers, the Court denies KCB's request for an equitable mitigation of damages.

## VII. CONCLUSION

For the foregoing reasons, a judgement is entered for Plaintiffs in the amount of $319,954.90, plus pre-judgment interest accruing from August 26, 1988. In calculating the pre-judgment interest award, the Court directs the Clerk to use the average of the Treasury Bill rate, referred to in 28 U.S.C. § 1961, for the period for which pre-judgment interest has been awarded. Damages are to be divided among the fourteen prevailing Plaintiffs pro rata, according to the amount of their PACA claims. The Clerk of the Court is directed to close the case.

**SO ORDERED.**